[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 53.]

THE STATE OF OHIO, APPELLEE, *v*. HENNESS, APPELLANT.

[Cite as *State v. Henness*, 1997-Ohio-405.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 96-536—Submitted February 19, 1997—Decided June 18, 1997.)

APPEAL from the Court of Appeals for Franklin County, No. 94APA02-240.

———————————

{¶ 1} Warren Keith Henness, appellant, was convicted of aggravated murder with specifications and sentenced to death for the killing of Richard Myers, a fifty-one-year-old lab technician from Circleville, Ohio.

{¶ 2} Myers was last seen alive on March 20, 1992. That morning, Myers told his wife he had something to do before he reported to work at midnight. Although Myers did not elaborate, his wife knew that he was an Alcoholics Anonymous volunteer and frequently traveled to Columbus to counsel others about drug and alcohol addictions. Myers was not home that afternoon when his wife returned from her job, and he failed to report to work that night.

{¶ 3} That same morning, appellant's wife, Tabatha, answered a telephone call at the residence where she and appellant were staying. The caller identified himself as "Dick" and asked for appellant. After the phone conversation ended, appellant told Tabatha he was going out. A car arrived for appellant. Tabatha recognized the driver as "Dick," a man who had picked up appellant several times before in the same car. Tabatha identified State's Exhibit 2-B as a photograph of the car she saw. The car belonged to Richard Myers.

{¶ 4} A few hours later, appellant returned to the house to pick up Tabatha. He was alone and driving Myers's car. They drove to a car wash on Mound Street in downtown Columbus and smoked crack.

**{¶ 5}** In his possession, appellant had checks and credit cards belonging to Richard Myers. Tabatha suggested that they involve Roland Fair, a drug dealer acquaintance, to pose as Myers to "po[p] the checks" and "play on the credit cards." The next day, appellant and Tabatha drove to Fair's apartment. Appellant told Fair that the owner of the checks, credit cards, and car was in a motel room with two prostitutes who were keeping him drunk.

**{¶ 6}** While at Fair's apartment, Tabatha saw appellant washing a butterfly knife in the bathroom sink. Later, Fair noticed the knife soaking in the sink. The knife had a dark stain on it. Appellant told Fair that it was his knife.

**{¶ 7}** Appellant, Tabatha, and Fair traveled to several banks and check-cashing outlets that day and the next, uttering forged checks and getting cash advances with the credit cards. With the money, they bought drugs. They also used the credit cards to buy merchandise, which they then sold for more drugs.

**{¶ 8}** At some point Tabatha suggested that appellant tell Fair the truth about Myers. According to Tabatha, appellant told Fair that the owner of the car, checks, and credit cards had pulled a gun on him, appellant shot him, "and the guy died." According to Fair, Henness never specifically said what he did to Myers, but he did say, "I did not want to do it. He made me do it."

**{¶ 9}** Later, appellant told Fair that the body was in the Nelson Road area in Columbus. The three discussed possible ways to dispose of it. According to Fair, Fair suggested a quarry. According to Tabatha, appellant was the one who suggested a quarry and stated that the body would never be found there.

**{¶ 10}** Two or three days after March 20, Tabatha saw appellant with a gold wedding ring that was too big for him. Appellant told her that it was Myers's. According to Fair, appellant offered the ring to him, but Fair did not want it.

**{¶ 11}** On March 23, appellant sold Myers's car to a sixteen-year-old drug dealer for $250. Appellant wrote out a fake bill of sale and signed it "Richard Myers." The next day, the police recovered the car and impounded it because its

owner was reported missing. The police questioned the sixteen year old and his companion, who led them to appellant.

{¶ 12} On March 25, the police received an anonymous telephone call alerting them to the body of a dead man in an abandoned water purification plant on Nelson Road. Upon investigation, police discovered the body of Richard Myers. His shoelaces were tied together, his mouth was gagged, and his hands were bound together behind his back with a coat hanger. Police found four .25 caliber shell casings and one live .25 caliber round near his body. The four casings were all ejected from the same weapon.

{¶ 13} An autopsy revealed that Myers had been shot five times in the head with .25 caliber bullets. One bullet had penetrated his brain, killing him. Myers had a large cut on his neck, which could have been inflicted with a butterfly knife such as State's Exhibit 6. Abrasions on his knees showed that his knees had struck a hard surface, and were consistent with being forced to kneel on a concrete floor. Myers's left ring finger had been severed six to eight hours after death.

{¶ 14} Columbus police arrested appellant on an unrelated charge on April 8, 1992. At the police station, it was apparently discovered that he was wanted on forgery charges. He was also a suspect in Myers's murder and homicide detectives questioned him. During the interrogation, appellant claimed Fair approached him with the checks and credit cards. Appellant suggested that Fair may have committed the murder. Appellant also told detectives he had not owned a gun since December 1990. However, Tabatha and Robert Curtis, at whose residence Tabatha and appellant were living, testified that appellant had a semiautomatic handgun, either a .22 or .25 caliber, in March or April 1992. Appellant sold the gun to a drug dealer about two weeks after the murder.

{¶ 15} On April 14, appellant was interrogated for a second time. He admitted he was with Myers on March 20 because Myers was helping him seek drug counseling and treatment for Tabatha. He also admitted that Fair was not

involved in the murder. Instead, appellant blamed the murder on some Cubans who were trying to settle a score with him. He stated Myers happened to be at the wrong place at the wrong time.

{¶ 16} Appellant was indicted for three counts of aggravated murder: (1) murder with prior calculation and design, R.C. 2903.01(A); (2) aggravated robbery-murder, R.C. 2903.01(B); and (3) kidnap-murder, R.C. 2903.01(B). Each count carried two death-penalty specifications under R.C. 2929.04(A)(7): aggravated robbery and kidnapping. He was also charged with aggravated robbery, kidnapping, four counts of forgery, and having a weapon while under disability.

{¶ 17} Appellant pled guilty to the forgery counts and elected to try the weapons charge to the court (which found him guilty). The jury found him guilty as charged on all the remaining counts. After a mitigation hearing, the jury recommended death. The trial court agreed and sentenced appellant accordingly. The court of appeals affirmed appellant's convictions and sentence of death.

{¶ 18} The cause is now before this court upon an appeal as of right.

_____

*Ronald J. O'Brien*, Franklin County Prosecuting Attorney, and *Joyce Anderson,* Assistant Prosecuting Attorney, for appellee.

*David J. Graeff*, for appellant.

_____

**FRANCIS E. SWEENEY, SR., J.**

{¶ 19} In this capital case, appellant presents twenty-five propositions of law for our consideration. (See Appendix.) Pursuant to R.C. 2929.05(A), we have carefully reviewed all issues raised. However, we summarily reject several of these arguments on the grounds that they either were not preserved, involve settled issues, or our independent review cures the error, if any. (Propositions of Law Four, Five, Nine, Eleven, Thirteen, Fifteen, Sixteen, Seventeen, Eighteen, Twenty, Twenty-one, Twenty-two, Twenty-three, Twenty-four, Twenty-five [b].) See, *e.g., State v.*

*Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus*; State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524; *State v. Bies* (1996), 74 Ohio St.3d 320, 658 N.E.2d 754.  We address, in opinion form, only those matters that merit discussion.  We also independently assess the evidence relating to the death sentence, balance the aggravating circumstances against the mitigating factors and review the proportionality of the sentence to sentences imposed in similar cases. For the following reasons, we affirm the court of appeals' judgment and uphold the sentence of death.

TESTIMONY OF TABATHA HENNESS

**{¶ 20}** Appellant presents several propositions of law dealing with the testimony of the prosecution's chief witness, his wife Tabatha Henness.  He claims that Tabatha's testimony was incompetent (Proposition of Law One), that it violated the statutory marital privilege (Proposition of Law Two), that he had no opportunity to effectively cross-examine her (Proposition of Law Fourteen), and that the testimony contained hearsay (Proposition of Law Three).

1.       *Competence to Testify*

**{¶ 21}** Appellant contends that his wife Tabatha was not competent as a witness, since her election to testify was not intelligently made.  According to Evid.R. 601(B)(2), "[e]very person is competent to be a witness except:  * * * [a] spouse testifying against the other spouse charged with a crime except when * * * [t]he testifying spouse elects to testify."  Recently, we construed this rule in *State v. Adamson* (1995), 72 Ohio St.3d 431, 650 N.E.2d 875, syllabus, and held that the testifying spouse "remains incompetent * * * until she makes a deliberate choice to testify, with knowledge of her right to refuse.  The trial court must take an active role in determining competency, and must make an affirmative determination on the record that the spouse has elected to testify."

**{¶ 22}** The court engaged in the following colloquy during its voir dire of Tabatha:

"[THE COURT]: The other exception that permits a spouse to testify against her husband * * * is if they elect to do so. You have a right, therefore, not to elect to testify against your husband in this case * * *.

"Now, the purpose of my asking these questions * * * is to make sure you understand your right under that rule * * *, you have [the] right to elect not to testify or to testify. Do you understand that rule?

"THE WITNESS: Yes, I understand.

"THE COURT: Okay. Now, the state * * * intends to call you as their next witness if you elect to testify in this matter.

"THE WITNESS: Yes, I do."

{¶ 23} Additionally, Tabatha testified that she understood the rule, knew what "voluntarily" meant, and was testifying voluntarily. She said defense counsel had previously told her she could elect whether or not to testify. She did not fear punishment for not testifying, and she denied having told counsel otherwise.

{¶ 24} *Adamson*, a case decided after the trial of this case, requires "an affirmative determination on the record that the spouse has elected to testify." *Id.* at syllabus. However, *Adamson* is distinguishable. There, the court never considered the applicability of Evid.R. 601. *Id.,* 72 Ohio St.3d at 431-432, 650 N.E.2d at 876. Here, counsel raised the issue, the court specifically explained Tabatha's rights to her, and she expressly affirmed that she was testifying voluntarily. Thus, our review of the record indicates that Tabatha's election was voluntarily made.

{¶ 25} Despite the record regarding Tabatha's election, appellant further argues that Tabatha's later conduct indicates that she did not understand her rights under Evid.R. 601.

{¶ 26} Tabatha's direct examination concluded on the afternoon of November 22, 1993. She was scheduled to return the next day for cross-

examination, but she did not appear. Instead, without the prosecution's knowledge, she fled to Texas. Tabatha did not return until November 29, 1993.

{¶ 27} Upon her return, Tabatha was again voir dired. She stated that she failed to appear for cross-examination because she was "nervous" and "stressed-out," and that "it is hard for me to testify against my husband." She also stated that her decision to return and give testimony was made, in part, because the prosecutor told her that she could be arrested on a bench warrant if she did not return. Tabatha never stated that she did not wish to testify or that she desired to revoke her election.

{¶ 28} Evid.R. 601(B)(2) states that a spouse is incompetent except when she "elects to testify." Thus, the decisive event is the spouse's election to testify, which triggers the exception, and not any event (such as an attempted revocation) subsequent to that election. The rule does not say that a competent spouse can become incompetent by changing her mind. The word "elect" implies a choice between inconsistent alternatives. Thus, a spouse cannot "elect" both to testify and not to testify in the same case. Moreover, strong policy reasons militate against interpreting Evid.R. 601 to allow revocation. In the search for the truth, exceptions to the allowance of relevant evidence should be construed narrowly. Further, since a defendant has a constitutional right to cross-examine a witness, a defendant's spouse could force a mistrial by testifying for the state, then refusing cross-examination. We reject appellant's first proposition of law.

## 2. *Marital Privilege*

{¶ 29} R.C. 2945.42 creates a privilege for spousal acts and communications:

"* * * Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third party competent to be a witness * * *."

{¶ 30} In his second proposition of law, appellant claims that "the vast majority of the testimony of Tabatha" breached this privilege. Despite his wide-sweeping claim, appellant points to only two incidents for our review:

a. On March 20, 1992, at Bob Curtis's house, Tabatha answered a phone call from "Dick," who wanted to speak with appellant. After speaking with "Dick," appellant said, "I'm going out," and he did.

{¶ 31} Tabatha testified that Curtis was in the kitchen, which was downstairs. According to Tabatha, Curtis's house was smaller than the courtroom in which this case was tried, and "anything said downstairs can be heard * * * all over the house * * * downstairs." Though the record is not clear, it appears that the phone was downstairs. Thus, it could be found that the conversation took place within Curtis's hearing.

b. Tabatha testified that she advised appellant to tell Fair "what happened." Appellant first said that "he d[id]n't think he should," but then told Fair "that he shot somebody, * * * and the guy died and that is whose car he had." According to Tabatha, Fair was in the car with her and appellant when this conversation occurred. She testified that Fair "couldn't hear me," but he was still present. She then testified to what appellant told Fair, which clearly was not privileged.

{¶ 32} Appellant did not specifically object to the above testimony. However, he made "a continuing objection" to testimony regarding acts not done in the presence of a third party. At times, a continuing objection is enough to

preserve error. *Brady v. Stafford* (1926), 115 Ohio St. 67, 152 N.E. 188, paragraph two of the syllabus. However, it was not sufficient in this case. The existence of the marital privilege turns on the specific circumstances surrounding each allegedly privileged communication, *e.g.,* whether a third party was present. Thus, appellant had to object specifically so the circumstances could be determined. This proposition of law is overruled.

### 3. *Effective Cross-Examination*

{¶ 33} In his fourteenth proposition of law, appellant contends that the trial court abused its discretion in failing to declare a mistrial following Tabatha's disappearance.

{¶ 34} Appellant argues that the "extended delay" between direct and cross-examination diminished the jury's recall of Tabatha's direct testimony, rendering cross-examination of her less effective. This argument is speculative. In fact, at trial, defense counsel argued the opposite, claiming prejudice because the jury had a week to "chew on and think about her direct testimony." Moreover, any prejudice stemming from "diminished recall" could be easily corrected; the defense could cross-examine in such a way as to remind the jury how Tabatha had testified on direct.

{¶ 35} Appellant also cites the "coercive nature of [Tabatha's] situation"— that the prosecution paid for her flight back to Ohio, and prosecutors picked her up at the airport and, stayed with her at the hotel. We find nothing wrong with the prosecutors' taking proper steps to ensure that Tabatha would not flee again.

{¶ 36} Appellant also alleges that the prosecutors "coached" Tabatha. One of the prosecutors admitted he told Tabatha that defense counsel would ask about her prior record, and he (the prosecutor) "gave her a chance to look at her prior record so that she could intelligently answer his questions."

{¶ 37} We find no reversible error. No general rule absolutely forbids attorney-witness contact between direct and cross-examination. *Perry v. Leeke*

(1989), 488 U.S. 272, 288-289, 109 S.Ct. 594, 604, 102 L.Ed.2d 624, 639 (dissenting opinion); *United States v. DeJongh* (C.A.1, 1991), 937 F.2d 1, 3. Trial courts may forbid such contact, and often do so, see *Perry,* 488 U.S. at 281-282, 109 S.Ct. at 600-601, 102 L.Ed.2d at 634, but here, the court did not. Such contact may create an appearance of impropriety, cf. *State v. Fields* (Aug. 9, 1993), Jefferson App. No. 92-J-20, unreported, 1993 WL 307625, but does not necessarily prevent a fair trial. Cf. *Price v. Cleveland Clinic Found.* (1986), 33 Ohio App.3d 301, 306, 515 N.E.2d 931, 936-937-.

**{¶ 38}** Here, the trial court found the contact nonprejudicial; it merely gave Tabatha "an opportunity to review [her] record so she could speak truthfully and honestly about that record." The defense was free to cross-examine Tabatha on these issues. "The opposing counsel in an adversary system is not without weapons to cope with 'coached' witnesses." *Geders v. United States* (1976), 425 U.S. 80, 89, 96 S.Ct. 1330, 1336, 47 L.Ed.2d 592, 600.

**{¶ 39}** Appellant also asserts that the court erroneously restricted his cross-examination of Tabatha. On cross-examination, the defense asked why she fled. Tabatha answered that she was "nervous" and "stressed" because it was hard to testify against her husband. The defense wanted to ask her about other cases where she had failed to appear in court, to show that she was being untruthful about why she left the state. The trial court refused to permit such an inquiry. This ruling was proper. Counsel said he wanted "to show that this is a person who manipulates the court system." In other words, he wanted to use Tabatha's "other acts" to prove her bad character to show that her behavior here conformed to that character. This would have violated Evid.R. 404(B).

**{¶ 40}** On redirect, Tabatha testified that part of the reason that she fled was because during her direct examination, appellant was looking at her and mouthing "I love you" and similar words. On recross, defense counsel asked her, "You didn't say anything to me about that when I was questioning you why you didn't show up,

did you?" The state objected that the question was misleading because the defense had not asked Tabatha why she was stressed. The trial court sustained the objection. Appellant claims this ruling was prejudicial. While the ruling was questionable, it was not unreasonable and, thus, did not amount to an abuse of discretion. We overrule this proposition of law.

### 4. *Hearsay*

{¶ 41} Tabatha testified that the person who phoned appellant on March 20 said, "This is Dick." In appellant's third proposition of law, he contends the caller's statement was hearsay. We agree. At trial, the state argued that it was not offering this out-of-court assertion to prove the truth of the matter asserted—that the caller's name was "Dick." Yet, we find that the name the caller used was relevant for no other purpose. However, we find no prejudice. Appellant claims that, without this hearsay, the state could not have shown that appellant and Myers were together on March 20. This is not true. Tabatha testified that she saw appellant leave the residence with a person whom she knew as "Dick." She identified Myers's car as the car she saw that morning. Appellant returned without Myers, yet with Myers's car and property. The fact that someone named "Dick" phoned appellant adds only weak support to the already strong evidence that appellant was with Myers on March 20. This proposition of law is without merit.

### OTHER ACTS/CHARACTER EVIDENCE

{¶ 42} Tabatha and Fair testified about their activities with appellant the day of the murder and the days following the murder, which included taking drugs, forging checks, and using stolen credit cards. In his sixth proposition of law, appellant argues that this was "character evidence," barred by Evid.R. 404(A).

{¶ 43} We find this evidence was relevant for non-character purposes. Appellant's drug addiction and use show his need for money and, hence, his motive to steal and kill. His use of stolen checks and credit cards shows he possessed

Myers's property the day after Myers disappeared, proving robbery and linking appellant to Myers's death.

**{¶ 44}** We also reject appellant's assertion that his use of the checks and credit cards was inadmissible because he had pled guilty to the forgery counts before trial. Since he deferred sentencing on these crimes until the conclusion of this trial, he argues "evidence of this plea of guilt should not have been introduced." Here, the state introduced evidence of the forgeries, not appellant's guilty plea.

GRAND JURY DISCLOSURE

**{¶ 45}** In his seventh proposition of law, appellant argues that he was entitled to a transcript of Roland Fair's grand jury testimony. We disagree.

**{¶ 46}** Grand jury proceedings in felony cases must be recorded pursuant to Crim.R. 22, and if the defendant demonstrates a particularized need that outweighs the reasons for grand jury secrecy, Crim.R. 6(E) gives him or her the right to inspect all relevant portions of that testimony. *State v. Benge* (1996), 75 Ohio St.3d 136, 144-145, 661 N.E.2d 1019, 1028; *State v. Grewell* (1989), 45 Ohio St.3d 4, 543 N.E.2d 93; *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982.

**{¶ 47}** As to particularized need, appellant claims that Fair's testimony has credibility problems because Fair's bond was reduced after his grand jury appearance. Appellant asserts that "the prosecution [got] what it want[ed], and then release[d] Fair through a favorable bond." We fail to understand appellant's argument. If Fair's release was a reward for pro-prosecution grand jury testimony, why would that lead one to suppose his grand jury testimony differed materially from his pro-prosecution trial testimony? Thus, appellant's claim that Fair's grand jury testimony may have differed from his trial testimony is mere speculation, insufficient to show particularized need. See *State v. Webb* (1994), 70 Ohio St.3d 325, 337, 638 N.E.2d 1023, 1034.

**{¶ 48}** Appellant also argues that the issue of secrecy was moot. Fair's participation in these crimes led to his indictment for forgery. Under Crim.R. 16(B)(1)(a)(iii), the state disclosed Fair's own grand jury testimony to him. Thus, appellant argues that, because the state had disclosed the testimony, it was no longer secret. Again, we disagree.

**{¶ 49}** Fair's testimony was never a secret from Fair himself. Thus, giving him a transcript of it did not decrease its secrecy. Information disclosed to a defendant under Crim.R. 16 does not thereby become a public record. *State ex rel. WHIO-TV-7 v. Lowe* (1997), 77 Ohio St.3d 350, 673 N.E.2d 1360. Hence, the testimony remained secret. This proposition fails.

## INTERROGATION TAPES

**{¶ 50}** In his eighth proposition of law, appellant claims that his April 14, 1992 statement to the police should have been suppressed because he had invoked his right to counsel during a prior interview which took place on April 8, 1992. Appellant believes that the police violated his rights by initiating a subsequent interrogation outside the presence of counsel.

**{¶ 51}** Appellant was interviewed by Columbus police detectives on April 8, 1992. This interrogation was recorded on videotape. Prior to questioning, appellant's rights were explained to him and he waived his right to counsel by executing a standard waiver form. Appellant was then questioned about the forgeries. Over the course of approximately three hours, appellant freely answered questions. Sometime during the interrogation, the detectives began questioning appellant about the murder. At this point, appellant stated, "I think I need a lawyer because if I tell everything I know, how do I know I'm not going to wind up with a complicity charge?" When the videotape was played to the jury, the tape was turned off just before this statement was made. At this interview, appellant insinuated that Fair may have been responsible for the murder.

{¶ 52} The second statement, recorded on audiotape, was made on April 14, 1992, after appellant had telephoned his friend, Teresa Thomas, from jail telling her that if the police came back he would talk to them. Prior to recording this statement, the police read appellant his constitutional rights. During this interrogation, appellant stated that a gang of Cubans, not Fair, was responsible for the homicide.

{¶ 53} If a suspect in a criminal investigation requests counsel at any time during questioning, he is not subject to further interrogation until a lawyer is provided or the suspect reinitiates the interrogation. *Arizona v. Roberson* (1988), 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704; *Edwards v. Arizona* (1981), 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386. However, the invocation of the right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. *Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 371. If the statement is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required. *Id.* As its rationale for such a rule of law, the United States Supreme Court stated:

"We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.' A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with

14

the police unassisted. Although *Edwards* provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—it is one that must be affirmatively invoked by the suspect." (Citation omitted.) *Id.* at 460-461, 114 S.Ct. at 2356, 129 L.Ed.2d at 372.

{¶ 54} The court in *Davis* then concluded that the statement "Maybe I should talk to a lawyer" was insufficient to require that questioning cease. Like the court of appeals, we find that appellant's statement "I think I need a lawyer * * *" is just as ambiguous as the statement made by the defendant in *Davis.* Thus, appellant's prior written waiver was still effective when the officers resumed their interrogation of him on April 14, 1992. Under these circumstances, the question whether the subsequent interrogation was initiated by appellant, through a third party (his friend Thomas), or police is irrelevant. We overrule this proposition of law.

## OUTSIDE CONTACTS

{¶ 55} In proposition of law nineteen, appellant contends that the trial court inadequately investigated the allegation that a friend of the victim's communicated with jurors.

{¶ 56} Defense counsel Bodiker informed the judge that he had heard from some friends of appellant's that a person claiming to be a friend of the victim had spoken to jurors during a recess and praised his character. Bodiker also had witnessed someone talking to a juror, but he did not hear what was said. Bodiker moved for a mistrial and also asked that "general inquiry be made of the jurors as to whether anybody talked to them about the case."

{¶ 57} The prosecutor identified Myers's friend as James Montgomery. After Bodiker told the prosecutor about the incident, the prosecutor warned Montgomery not to talk to the jurors.

{¶ 58} The trial court assembled the jury and, as a whole, asked them if anyone had "tried to engage you in conversation about this case." Juror Clark

15

responded. The court then individually questioned her at sidebar. She stated that someone had approached her and asked the defendant's name, the lawyers' names, and "what kind of case it was, and what was going on." The juror told him she was not at liberty to discuss the case and she then walked away. She told the court she could be fair despite the incident. The court tentatively overruled the motion for mistrial but agreed to hear defense evidence.

{¶ 59} Later in the trial, outside the presence of the jury, the defense produced two witnesses. The first witness, Tamla Newman, was appellant's friend. She testified that Montgomery approached her and asked her if she was a juror or if she knew any jurors. She stated that Montgomery told her that Myers "was like a father to him," and he said that he had gone to the murder scene with some of the jurors. She also saw Montgomery in the courthouse cafeteria four or five feet from the jurors, but she "couldn't swear" that he was talking to any of them.

{¶ 60} The second witness, Newman's companion, testified that she saw Montgomery in the cafeteria. He "looked like" he was talking to some people at another table wearing juror badges. However, the witness was not sure that they were jurors in this case. She did not pay much attention and did not hear what Montgomery had said.

{¶ 61} The prosecution called Montgomery. Montgomery admitted asking someone, "[A]re you a juror?" When the juror answered "Yes," Montgomery stated he said nothing more. He testified that he had gone to the murder scene before the trial began, but he did not tell anyone that he had gone with the jury. Montgomery also testified that he did not knowingly speak to or see any jurors in the cafeteria.

{¶ 62} Finally, the court let the jury see Montgomery, and asked the jury if "Mr. Montgomery ever approach[ed] any of you * * * and tr[ied] to engage you in any conversation about the trial?" No juror responded. The judge asked juror Clark

16

if it was Montgomery who had spoken to her. She answered in the negative. The court then said:

"As I understand it then, none of you recognize Mr. Montgomery, and * * * he never approached any of you in any way to discuss or try and engage you in any conversation with this trial?"

{¶ 63} Again, no juror responded.

{¶ 64} Appellant faults the court for failing to question each juror individually. However, he did not ask the court to do so. Moreover, the scope of voir dire is within the trial court's discretion, *State v. Webb,* 70 Ohio St.3d at 338, 638 N.E.2d at 1035, and we find no abuse of this discretion. Apparently one juror failed to report his or her contact with Montgomery. But Montgomery asked only if he or she was a juror. The juror may have forgotten this brief, innocuous contact. Under these circumstances, the court could reasonably decline to interrogate the other eleven jurors individually. We overrule this proposition of law.

ASSISTANCE OF COUNSEL

{¶ 65} In his tenth proposition of law, appellant contends that the trial court abused its discretion in denying defense counsel's motion to withdraw from the case before the mitigation hearing. However, "[t]o discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." *State v. Coleman* (1988), 37 Ohio St.3d 286, 525 N.E.2d 792, paragraph four of the syllabus. The term of art "actual conflict" refers not to a personality conflict but to a conflict of interest. *Strickland v. Washington* (1984), 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674, 696. The Sixth Amendment does not guarantee "rapport" or a "meaningful relationship" between client and counsel. *Morris v. Slappy* (1983), 461 U.S. 1, 13-14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610, 621.

**{¶ 66}** Appellant argues that "personal differences" between him and one of his attorneys prevented his attorneys from adequately preparing for the penalty phase and presenting mitigating evidence. At trial, appellant claimed counsel had pursued strategies against his wishes, lied to him, given bad advice, and violated the attorney-client privilege. Appellant called his lawyers "these clowns" and said he did not trust them. Attorney Bodiker agreed that "hostility and tension" existed between counsel and client.

**{¶ 67}** Appellant claims that it was because of these differences that his counsel presented so little mitigation. However, counsel investigated and prepared for the penalty phase. Bodiker stated, "We did investigate and * * * do the things that we feel would be appropriate, and we did interview witnesses and we did talk to professional experts." However, appellant rejected those efforts. A defendant may decide what evidence, if any, to present at a mitigation hearing and may decide to present no evidence at all, even against the advice of his counsel. *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576.

**{¶ 68}** Appellant's counsel had filed a list of many witnesses, which included several members of appellant's family that they intended to call at the mitigation hearing. The court asked appellant if he wanted to call these witnesses. Appellant stated he did not wish to do so. Hence, we dismiss, as unfounded, appellant's assertion that he did not know he could call these witnesses.

**{¶ 69}** This case is unlike *State v. Johnson* (1986), 24 Ohio St.3d 87, 24 OBR 282, 494 N.E.2d 1061, where this court found that the failure to investigate resulted in the dearth of mitigation evidence. Here, defense counsel presented less evidence than they had discovered by investigation because appellant limited the evidence he would allow them to present.

**{¶ 70}** In sum, it is clear that hostility existed between appellant and attorney Bodiker even before the mitigation trial. However, at no time did this

personality conflict erode Bodiker's representation of appellant to the point of rendering it ineffective. This proposition of law is without merit.

SUFFICIENCY OF EVIDENCE

{¶ 71} In Proposition of Law Twenty-five (a), appellant asserts that the evidence was insufficient to support conviction. He bases this claim on the incorrect premise that Tabatha's testimony was inadmissible. As previously discussed in this opinion, this contention is meritless.

{¶ 72} We find the evidence sufficient in all respects. On the morning of March 20, Tabatha saw appellant with Myers. Appellant admitted that he was with Myers on this day. This was the last day that Myers was seen alive. Appellant returned later that day driving Myers's car. He was alone and had Myers's credit cards and checks. Appellant pled guilty to the forgery charges.

{¶ 73} Tabatha and Fair saw appellant with a wedding ring that did not fit him. Appellant told them that it had belonged to Myers. Myers's left ring finger was severed. Appellant told Fair that he had shot someone. Myers had been shot. Appellant told Fair that the body was in the Nelson Road area. The body was discovered in an abandoned water purification plant on Nelson Road.

{¶ 74} Myers had been shot with a .25 caliber weapon, probably a semiautomatic. Appellant owned either a .22 or .25 caliber semiautomatic handgun, which he sold a few weeks after the murder. Appellant was observed washing a butterfly knife which had a dark stain on it. Appellant admitted the knife belonged to him. Myers was cut with a weapon consistent with a butterfly knife.

{¶ 75} The state also proved prior calculation and design. The jury could infer that appellant brought a knife and loaded gun with him to the murder scene; it is unlikely that he found these weapons in an abandoned building. Myers was tied up, forced to kneel, his neck was slashed, and he was shot twice from behind and three times from the front.

**{¶ 76}** We find that the evidence is sufficient to prove aggravated murder on counts one, two, and three, kidnapping, aggravated robbery, and both felony-murder death specifications, all beyond a reasonable doubt.

PENALTY PHASE

**{¶ 77}** In his twelfth proposition of law, appellant contends that the trial court erred by admitting his criminal record in the penalty phase.

**{¶ 78}** In 1982, appellant was convicted of burglary, grand theft, and two counts of passing bad checks. In 1984, appellant was convicted of receiving stolen property. In 1987, appellant was convicted of escape from a halfway house. In his unsworn statement, appellant told the jury that he had been to prison three times. The state then sought to introduce appellant's prior convictions, arguing that he had drawn a misleading picture of his criminal history. After the court overruled appellant's objection, appellant stipulated to the convictions without conceding admissibility.

**{¶ 79}** In *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph three of the syllabus, this court ruled that a prosecutor, in the penalty phase of a capital case, may rebut false or incomplete statements regarding the defendant's criminal record. This right is limited, however, to those instances where the defense offers a specific assertion, by a mitigation witness or by defendant, that misrepresents the defendant's prior criminal history.

**{¶ 80}** Appellant did not misrepresent his past. He merely made the statement that he had been to prison three times, and this was true. To allow the state to rebut this statement is contrary to the holding of *DePew*.

**{¶ 81}** In *DePew*, this court also recognized that "the purpose of an unsworn statement is to avoid cross-examination, particularly about one's prior criminal record." *Id.* at 286, 528 N.E.2d at 555. It is only when the defendant falsely claims in his unsworn statement that he has little or no prior criminal history that a prosecutor can be permitted to demonstrate this inaccuracy. *Id.* Clearly, this was

not the case here.  However, we find this error to be harmless.  Appellant admitted he was incarcerated on three separate occasions; his criminal record supports his statement.  We reject this proposition of law.

INDEPENDENT SENTENCE REVIEW

{¶ 82} Pursuant to R.C. 2929.05, we independently weigh the aggravating circumstances against the mitigating factors and determine whether appellant's death sentence is disproportionate to sentences in similar cases.

{¶ 83} The evidence establishes beyond a reasonable doubt that appellant murdered Myers while committing aggravated robbery and kidnapping, and that appellant was the principal offender.  The facts show that the victim was taken to a secluded area where he was bound and gagged.  He was then knifed and brutally shot to death.  Sometime later, Myers's finger was severed so that appellant could steal his wedding band.  Appellant used checks, credit cards, and a vehicle stolen from Myers in order to obtain money to buy drugs.

{¶ 84} In mitigation, appellant called his cellmate, two former cellmates, and two jail officers to testify about his character and conduct in the Franklin County Jail.

{¶ 85} Appellant's cellmates testified that they never saw him threaten or assault others.  All three depicted him as a peacemaker and protector of smaller or weaker inmates.  They testified that appellant was a religious man and that he had counseled others on religious matters.

{¶ 86} One officer testified that appellant had been disciplined only once for fighting during his pretrial incarceration.  For this conduct, appellant had received a warning because he was protecting a newer, weaker inmate from having his food tray stolen, and the inmate was not the aggressor.

{¶ 87} Another jail officer testified that appellant informed on a fellow prisoner who had a sharpened piece of glass or plastic in his cell.  The officer testified that jailhouse informants risk their lives by informing, but sometimes

inform "to look good." He also testified that a "pecking order" exists in jail, and an experienced inmate can run his cell if he can impress the younger inmates.

{¶ 88} Appellant also raised residual doubt. A homicide detective and a forensic pathologist testified that Myers's hands were not tested to see if he had fired a gun. However, the detective testified that such tests are done only when a suspect is arrested immediately after a shooting. The lapse of time between the murder and the discovery of the body would have made these tests worthless.

{¶ 89} Another detective testified that he had questioned Tabatha some years earlier in connection with a suspected homicide. The detective had heard that Tabatha was claiming to know about a woman being beaten, murdered, and mutilated by Cuban drug dealers. Checking the story out, the detective found evidence of violence where the murder supposedly occurred, but no body was ever discovered.

{¶ 90} A fingerprint examiner testified that he did not find appellant's fingerprints in Myers's car or the abandoned building. He did find a few prints belonging to Tabatha in and on the car. However, this evidence is of little value because appellant admitted taking the car.

{¶ 91} In his unsworn statement, appellant claimed he went to the abandoned building on March 20 to steal electrical motors. He denied killing Myers, but cryptically admitted that "what happened was because of me, people I was involved with." He said, "it is my fault the man died. He wouldn't have been there. Nobody else * * * would have been there." Appellant claimed he ran from the building when he "heard the shots that finished [Myers] off." He admitted stealing Myers's car, wallet, and checks, but claimed he came back later to take the car, and found the wallet and checkbook in the glove compartment. Appellant said he was "sorry for what happened, but by no means was Richard [Myers] a saint." He also claimed that "[in] one week's time, I stopped two muggings up in the Short North."

{¶ 92} Appellant's attempts to establish residual doubt are unpersuasive. His good record in pretrial confinement is a mitigating factor, but is entitled to little weight. His criminal record is significant and, thus, fails to qualify as a mitigating factor under R.C. 2929.04(B)(5). The evidence proved him to be the principal offender, and his vague allegations about "people I was involved with" do not refute that evidence or establish a mitigating factor under R.C. 2929.04(B)(6). No other mitigating factors apply.

{¶ 93} We find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶ 94} Finally, R.C. 2929.05(A) requires us to consider whether the sentence imposed in this case was excessive or disproportionate to the sentence imposed in other similar cases. *State v. Steffen* (1987), 31 Ohio St.3d 111, 123, 31 OBR 273, 283, 509 N.E.2d 383, 394. In doing so, we find that this court has often upheld death sentences for aggravated murder coupled with aggravated robbery and kidnapping. See, *e.g., State v. Cook* (1992), 65 Ohio St.3d 516, 530-531, 605 N.E.2d 70, 85; *State v. Roe* (1989), 41 Ohio St.3d 18, 28-29, 535 N.E.2d 1351, 1363. Indeed, it has frequently upheld death sentences based solely on a specification of murder during kidnapping, and has also upheld the imposition of death stemming solely from murder in the commission of aggravated robbery. *State v. Scott* (1986), 26 Ohio St.3d 92, 26 OBR 79, 497 N.E.2d 55. In *Roe,* the defense presented far stronger mitigation than that presented by appellant. *Id*., 41 Ohio St.3d at 28, 535 N.E.2d at 1351. Accordingly, we affirm appellant's convictions and death sentence.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

APPENDIX

{¶ 95} Proposition of Law One: "The trial court commits prejudicial error in permitting the testimony of the wife of the accused, without an adequate finding of competency, pursuant to Evid.R. 601(B)(2), contra the Federal and Ohio Constitutions."

{¶ 96} Proposition of Law Two: "Prejudicial error occurs when the wife of the accused is permitted to testify to privileged marital communications contra R.C. 2945.42 and Evid.R. 501."

{¶ 97} Proposition of Law Three: "The trial court commit[s] prejudicial error in permitting the wife of the accused to testify to hearsay declarations from a telephone conversation, contra the Sixth and Fourteenth Amendments to the Constitution."

{¶ 98} Proposition of Law Four: "Where the jury instructions fail to narrow the offense classification as statutorily required and where the specification instruction given is improper, the verdict as to the specifications is invalid, contra the Eighth and Fourteenth Amendments to the Constitution."

{¶ 99} Proposition of Law Five: "Prosecutorial misconduct occurs in closing argument when the prosecutor denigrates defense counsel, comments improperly on the silence of the accused and appeals to the passions of the jury, contra the Federal and Ohio Constitutions."

{¶ 100} Proposition of Law Six: "Prejudicial error occurs when character evidence of the accused is presented through the testimony of two prosecution witnesses, when the issue of character is never raised by the defense, contra the Fifth, Sixth and Fourteenth Amendments to the Constitution."

{¶ 101} Proposition of Law Seven: "The trial court commits prejudicial error when the Grand Jury transcripts of a crucial witness are requested by the defense and the court refuses to disclose them after the defense shows a particularized need, contra the Fifth, Sixth and Fourteenth Amendments to the Constitution."

{¶ 102} Proposition of Law Eight: "The trial court commits prejudicial error in overruling a Motion to Suppress a statement of the accused, after his right to counsel had been invoked, contra the Fifth, Sixth and Fourteenth Amendments to the Constitution."

{¶ 103} Proposition of Law Nine: "Prosecutorial misconduct occurs during the trial when the prosecution attempts to introduce prejudicial evidence, and when the prosecution attempts to taint the testimony of a crucial witness."

{¶ 104} Proposition of Law Ten: "Where an actual conflict arises between defense counsel and the accused before the Mitigation Hearing begins, the trial court commits prejudicial error in overruling a Motion to Withdraw, contra the Sixth and Fourteenth Amendments to the Constitution."

{¶ 105} Proposition of Law Eleven: "The trial court commits prejudicial error in imposing the sentence of death when the aggravating circumstances the court relies upon as a basis for the sentence are flawed, contra the Eighth and Fourteenth Amendments to the Constitution."

{¶ 106} Proposition of Law Twelve: "The trial court commits prejudicial error in allowing the prosecution to introduce the entire past criminal record of the accused, after his unsworn statement, contra the Ohio and Federal Constitutions."

{¶ 107} Proposition of Law Thirteen: "The trial court erred in refusing defendant's request to instruct the jury in the Mitigation Hearing on the mitigating factor of 'residual doubt.' "

{¶ 108} Proposition of Law Fourteen: "In denying defendant's Motion for a Mistrial, the trial court committed an abuse of discretion that denied defendant the right to a fair trial and further denied defendant his right for a meaningful opportunity for cross-examination of State's witness Tabatha Henness, in contravention of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section Ten of the Ohio Constitution."

{¶ 109} Proposition of Law Fifteen: "The trial court erred in admitting into evidence unredacted videotape and audiotape exhibits which contained prejudicial evidence of criminal offenses committed by defendant that were not relevant to the issues at trial."

{¶ 110} Proposition of Law Sixteen: "Defendant's conviction and sentence of death resulted from a pattern of prosecutorial misconduct that pervaded the trial and sentencing phases, in contravention of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections Nine and Ten of the Ohio Constitution."

{¶ 111} Proposition of Law Seventeen: "Defendant's conviction and sentence of death resulted from a denial of the right to effective assistance of counsel, in contravention of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections Nine and Ten of the Ohio Constitution."

{¶ 112} Proposition of Law Eighteen: "A sentence of death must be vacated when duplicative aggravating circumstances are presented to the jury at the Mitigation Hearing and the trial court relies upon the duplicative aggravating circumstances in its decision, contra the Eighth and Fourteenth Amendments to the United States Constitution."

{¶ 113} Proposition of Law Nineteen: "Prejudicial error occurs when the trial court fails to hold an individual voir dire hearing regarding jury misconduct, when evidence is presented that jurors communicated with a friend of the victim's family."

{¶ 114} Proposition of Law Twenty: "Prejudicial error occurs when gruesome photos, having no direct relevance to the offense, are allowed to be introduced."

{¶ 115} Proposition of Law Twenty-one: "The accused does not receive a fair trial when character evidence is introduced for the sole purpose of proving he

acted in conformity on a particular occasion, contra Evid.R. 404(A) and the Federal and Ohio Constitutions."

{¶ 116} Proposition of Law Twenty-two: "The trial court commits prejudicial error in refusing to re-open the case, and the right to present witnesses in his behalf consistent with the Sixth Amendment is abridged, when the accused requests further witnesses testify at the Mitigation Hearing."

{¶ 117} Proposition of Law Twenty-three: "When alternate jurors are instructed to be present in the jury room during deliberation proceedings at the Mitigation phase, with no specific role instructions, prejudicial error occurs as a matter of law."

{¶ 118} Proposition of Law Twenty-four: "The trial court commits prejudicial error in denying a Motion to Suppress the statement of the accused on April 8-9, 1992, contra the Fifth and Fourteenth Amendments to the Constitution."

{¶ 119} Proposition of Law Twenty-five: "(a) The verdicts are insufficient as a matter of law to sustain a conviction. (b) The imposition of the death penalty is cruel and unusual punishment, and constitutionally impermissible, contra the Federal and Ohio Constitutions."