OPINION
Defendant-appellant, Donald R. Mills, appeals his conviction for murder. We affirm.
At about 9:00 a.m. on October 13, 1994, appellant called 911. Appellant told the emergency operator: "My fiancee is outside. I don't know whether she's alive or not * * *."
Vicky Conneighton, a fire fighter paramedic with the Union Township Fire Department, answered the call. Conneighton arrived at the home of Mildred ("Millie") Mills to find nineteen-year-old Kristina ("Kristy") Harris lying dead in Millie Mills' backyard surrounded by fallen leaves.[1] When Conneighton found her, Harris was stiff with rigor mortis. Harris was lying on her back with her left knee bent up and her arms outstretched. Her left hand held an empty liquor bottle. A "thick mucousy-type liquid" — possibly vomit — covered her face and hair. Her long hair, matted with dirt and leaves, was spread out around her face. Harris was dressed in blue jeans and a tee-shirt. The zipper of her jeans was open, and only one button was fastened. She was not wearing underpants.
On March 6, 1996, a grand jury indicted appellant for the murder and involuntary manslaughter of Kristy Harris. The case was tried to a jury. Testimony at trial included the following:
Conneighton testified that she spoke with appellant shortly after she found Harris. According to Conneighton, appellant did not show signs of having been in a struggle. However, appellant stated that he and "his girlfriend had had an argument in a bar" the night before. Appellant told Conneighton that they continued to argue in the car on the way home, and after they arrived home. When he was "tired of fighting with her," appellant went to bed.
Patty Brannum, the victim's mother, testified concerning her daughter's four and one-half year relationship with appellant. Appellant and Harris began dating in high school. Harris became pregnant with appellant's child, and in April 1991, she gave birth to Destiny. According to Brannum, the couple "got along good off and on." But, there were also times, Brannum testified, when: "they weren't getting along, Kristy would come home and stay for a day or two and go back. She wanted it to work out * * * but they had arguments."
In 1994, the arguing got worse. In July 1994, appellant and Harris were living with Millie Mills. At one point, Millie Mills called Brannum and "said Don and Kristy just weren't getting along, it just wasn't going to work, and that I [Brannum] needed to come get Kristy." Brannum retrieved Harris from Millie Mills' house. Sometime later, Brannum and Harris went to collect Harris' belongings from Mills. They arrived at Millie Mills' house to find "Kristy's stuff * * * strewed [sic] in boxes all over the front of the driveway." Appellant's sister told them, "Mom said that's all you get."
For the rest of the summer Harris and Destiny lived with Brannum. The couple continued to argue "quite a bit," sometimes over arrangements concerning Destiny, e.g., custody, child support, and visitation. One such argument took place during a telephone conversation that was recorded and played for the jury. In that conversation, appellant refused to return Destiny to Harris at the end of her weekend visit with him. Appellant told Harris that he would be keeping Destiny during the week and leaving her at "day care" during the day. Harris, who was not working at the time, objected to this arrangement and repeatedly asked appellant to return Destiny.
On August 18, 1994, Harris was awarded temporary custody of Destiny. On September 21, 1994, appellant was ordered to pay child support. In mid-September 1994, Harris and appellant began to spend more time together. Harris began spending the night with appellant at Millie Mills' house. About one month before Harris died, Harris and appellant became engaged to marry.
Concerning Harris' condition when she died, Brannum testified that Harris did not take drugs, but that she drank alcohol on occasion. She did not drink "a lot," and she did not drink hard alcohol straight. Brannum testified that it was "not unusual" for Kristy to go without underwear, but that she would "definitely" wear underwear if she were menstruating.
Finally, Brannum testified appellant accompanied police to Wal-Mart where she worked to tell her that Harris had died. At that time, Brannum noticed that appellant's right arm bore scratch marks from his knuckles to his elbow. She also observed that appellant did not seem upset. She noticed no signs that appellant had been crying.
Dr. Ila Mehta, a pathologist at Clermont Mercy Hospital, performed the first of two autopsies of Kristy Harris. When Harris' body was delivered to her, Mehta was told "she drank too much, hit her head and died." During the autopsy, Mehta observed initially that one of Harris' fingernails was badly torn. She scraped underneath the fingernails, but did not find any material under them. Mehta saw bruises on Harris' forearms, but from their color, determined that they were more than a few days old. Mehta saw no other external injuries.
Mehta found a slight amount of blood in Harris' vagina, indicating that she may have been menstruating. Mehta found no injuries to Harris' internal organs except that Harris had petechial hemorrhages in both lungs. She also found petechial hemorrhages in Harris' face and under her eyelids. Mehta testified that petechial hemorrhaging is consistent with asphyxiation. Mehta did not find any obstruction in Harris' airway, nor did she find any natural causes of asphyxia. Mehta did not look inside Harris' mouth for blockage. Harris' blood alcohol level was .04, indicating that she had not had much to drink.
Finally, in a highly unusual and still unexplained finding, Mehta discovered a three-inch long blade of grass deep in Harris' trachea. At trial, Mehta stated, "[Y]ou could not get that unless you take a deep gasp while you are alive, to have that blade go down as low as she had that." Mehta testified that her findings were not consistent with "the story which [she] had been given," i.e., that Harris "was heavily drinking and died because of that." Mehta testified further that from these findings, Harris' death "seem[ed] like a homicide."
Jeff Sucher and Terrence D. Zinser, sergeants with the Union Township Police Department, were dispatched to Millie Mills' house on the morning of October 13, 1994. Sucher testified that after seeing Harris' body in Millie Mills' backyard, he presumed her death had been accidental and was similar to other deaths "where people just basically drank alcohol to the point where they vomited and actually chocked [sic] on their own vomit." When Sucher spoke with appellant that morning, he observed that appellant wasn't upset or crying. Appellant told Sucher that the previous evening he and Harris went to a bar in Cincinnati with three other people to listen to her brother's band. They returned home around 3:00 a.m. Appellant said he went to bed immediately. The last time appellant saw Harris, she was going into the bathroom to get ready for bed.
Appellant told Sucher that he woke up at 9:00 a.m. the next day, couldn't find Harris and, after looking for her, found her in the backyard. After calling 911, appellant called a friend, Brian Sebastian, to take Destiny to day care. Appellant also told Sucher that Harris rarely drank, and that the bottle in her hand came from the nightstand in their bedroom. Appellant remembered that the bottle was about half full.
On October 24, 1994, Sucher interviewed appellant again. In this conversation, appellant stated that Harris had not been drinking the night before she died because she was the designated driver. When asked about the argument, appellant replied that he and Harris had not argued, but were "getting along great that night." This time, appellant told Sucher that the next morning he got up around 8:00 a.m., took a shower, "got ready, got the baby up and gave her some cereal and got her all washed up and cleaned up, and got her clothes on her, and at that time, it was time to leave." Appellant continued, "[T]hat's when I noticed Kristy's car was there." At that point, appellant claimed, he found Harris and called 911. Sucher also testified that he had Harris' fingernails scraped and that there was no residue under her nails.
Sergeant Zinser conducted a follow-up interview with appellant on December 16, 1994, which also was videotaped. Appellant reiterated that on the night before Harris died, he and Harris returned from the bar at about 2:30 a.m. They went directly inside the house. He fell asleep immediately, and "she went straight for the bathroom." Appellant again denied arguing with Harris that evening. Appellant also stated that he always has scratches on his arms from his job, which requires him to stick his hands up in dashboards to release speedometer cables.
Harris' body was exhumed in April 1995 so that a second autopsy could be performed. Dr. Lee Lehman, deputy coroner and forensic pathologist for Montgomery County, Ohio performed the autopsy. Lehman testified that at the time of the second autopsy Harris' body was still in "very good shape" internally. Lehman's "significant findings" included the following: a bruised lower lip consistent with her lip being pressed against her teeth, a bruise over the center of her forehead, small hemorrhages on her larynx and bruises on her arms and her ankle. Lehman stated that in his opinion, Harris died from "smothering with aspiration of grass," and that her death was a homicide. Lehman also testified that alcohol did not play a role in her death.
Lehman stated that Harris "could not have died in the position she was found" because her legs, with one knee up, were "defying gravity." He stated, "When a person dies they become completely limp. Later they stiffen up, and it's called rigor. If she would have died in this position, her legs would be flat and in particular her left knee would be at least laying against her right knee. The leg would not be up in the air." It was his opinion that Harris was moved after she died and that the empty bottle was placed in her hand. Lehman could not, however, pinpoint the time Harris was killed.
The state presented the testimony of several witnesses that was, apparently, intended to show that appellant had a motive to kill Harris. Michelle Gray began dating appellant in July 1994 after Harris moved back to her mother's house. Appellant and Gray dated for about a month and then broke up after a child custody hearing in which Harris was awarded custody of Destiny. After the hearing, appellant was upset. Appellant told Gray, "We can't see each other any more because of Destiny." Appellant also told Gray that he wanted to be with her, not Harris, but "the only way he could see Destiny, is if he was with Kristy."
Gray and appellant continued to see each other, however. They dated sporadically from July until late September 1994. During the week of September 26 to October 1, 1994, appellant told Gray he didn't want to see her again. Two weeks later, a few days before Harris' death, appellant called Gray and asked her to go out. She agreed to go to lunch and "discuss things." However, Gray told Mills, "* * * Kristy needs to be moved out before you and I start going back out." Gray next spoke with appellant at 8:00 a.m. the morning Harris was found dead. According to Gray, appellant "was very sleepy." Appellant told Gray that he and Kristy had gone out the night before and that he didn't remember how he got home or how he got into bed. He also asked Gray to go out on the following Saturday, Sweetest Day. Gray agreed to go, but only if Harris was "moved out." According to Gray, appellant responded, "Don't worry. She'll be gone by Saturday."
Joanne Trisler, an employee of the Western Southern Life Insurance Company, testified that in early October 1994 she went to Millie Mills' home to collect an insurance premium. Appellant and Harris were there. During that visit, Millie Mills, Harris, and Trisler agreed that Kristy should have a life insurance policy in the amount of $15,000 with Millie Mills and Don Mills as the primary beneficiaries. Later, Trisler testified, Harris indicated that with the wedding coming up she didn't want to take time to meet with Trisler to sign the necessary documents. After Harris' death, according to Trisler, Millie Mills called to make a death claim and was "a little upset" when she learned that Harris had not signed the application. Millie Mills then let her other policies with Trisler lapse.
The testimony of two of Millie Mills' neighbors contradicted appellant's account of his actions on the morning of October 13, 1994. Juanita Schuster, who lived across the street from Millie Mills, testified that at about 8:00 a.m. she saw appellant come outside "walk behind the car, * * * walk over to a bush * * * and look in the bush." Jack Miller, the adult son of Millie Mills' next-door neighbor, was visiting his mother shortly before 8:00 a.m. on the morning of October 13, 1994. Miller testified that he heard loud voices coming from the Mills' residence. Miller looked in the direction of the voices and saw appellant in the driveway of Millie Mills' home. Miller testified that he saw appellant's head "and then he dropped down like he was getting into a car, opening the car door and getting into the car."
Millie Mills, appellant's mother, testified that the night of Harris' death, she went to bed at her usual hour, about 9:30. She awoke when "the kids came home," and heard them chatting quietly as they came inside. Mills heard Harris go into the bathroom for her "normal nightly ritual." Mills did not remember how long she was awake. The next morning, Mills got up at 5:00 a.m. and left for work. Millie Mills denied talking to Trisler about a policy on Harris' life and stated that they met instead to discuss reinstating a policy in appellant's name. According to Mills, it was Harris who wanted a life insurance policy. Mills also denied demanding payment on Harris' life insurance policy from Trisler.
At the close of the state's case, appellant moved for judgment of acquittal pursuant to Crim.R. 29. The motion was denied. Appellant was convicted of murder and sentenced to fifteen years to life.[2] This appeal followed.
Appellant presents the following eight assignments of error for review:
Assignment of Error No. 1:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY FAILING, SUA SPONTE, TO EXCLUDE FROM THE EVIDENCE A VIDEOTAPE INTERVIEW BETWEEN APPELLANT AND A POLICE OFFICER, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, AND ART. I. SECTIONS 10 AND 14 OF THE OHIO CONSTITUTION.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY ENTERING JUDGMENT OF CONVICTION AFTER A TRIAL IN WHICH APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, SECURED TO HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, AND BY ART. I. SEC. 10 OF THE OHIO CONSTITUTION.
Assignment of Error No. 3:
 THE JUDGMENT OF CONVICTION ON ALL COUNTS IS CONTRARY TO LAW AND TO THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES IN THAT THERE WAS INSUFFICIENT EVIDENCE ADDUCED TO ESTABLISH EACH AND EVERY ELEMENT OF EACH OFFENSE BEYOND A REASONABLE DOUBT.
Assignment of Error No. 4:
 THE JUDGMENT OF CONVICTION ON ALL COUNTS IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
Assignment of Error No. 5:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DENYING HIS MOTIONS FOR JUDGMENT OF ACQUITTAL PURSUANT TO CRIM.R. 29 (T.p. 953).
Assignment of Error No. 6:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY ENTERING JUDGMENT OF CONVICTION WHERE THE TRIAL TACTICS OF THE PROSECUTION SHIFTED THE BURDEN OF PROOF TO THE DEFENSE, IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW, SECURED TO HIM BY THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES, AND ART. I. SEC. 16 OF THE OHIO CONSTITUTION.
Assignment of Error No. 7:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY ENTERING JUDGMENT OF CONVICTION AFTER A TRIAL IN WHICH THE PROSECUTORS COMMITTED MISCONDUCT INIMICAL TO THE DUE PROCESS RIGHT OF THE ACCUSED TO A FAIR TRIAL.
Assignment of Error No. 8:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT'S RIGHT TO CONFRONTATION SECURED TO HIM BY THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION, AND ART. I. SEC. 10 OF THE OHIO CONSTITUTION, IN SUSTAINING THE STATE'S OBJECTIONS DURING CROSS EXAMINATION OF A PATHOLOGIST.
In the first assignment of error, appellant complains that the videotape of his December 16, 1994 interview with Detective Zinser was admitted into evidence in violation of appellant'sFourth Amendment right to be free from illegal seizure, hisFourteenth Amendment rights under the federal and state constitutions, his Fifth Amendment right against self-incrimination, and his Sixth Amendment right to counsel.
As an initial matter, we find that appellant has waived his right to obtain appellate review of the issues raised in this assignment of error because he did not move to suppress the videotape at trial. When asked by the trial court if he had objections to the admission of the videotape into evidence, appellant's counsel replied that he did not. "An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." State v. Williams (1977), 51 Ohio St.2d 112, paragraph one of the syllabus.
In any case, the claims raised by appellant in this assignment of error lack merit. Appellant states, first, that the videotape is the fruit of his illegal arrest and, therefore, should not have been admitted into evidence. We find, however, that appellant was not under arrest when he spoke with police on December 16, 1994.
An arrest occurs if the following elements are present: "(1) An intent to arrest, (2) under a real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is understood by the person arrested." State v. Barker (1978), 53 Ohio St.2d 135, paragraph one of the syllabus, certiorari denied (1978), 439 U.S. 913, 99 S.Ct. 285. Police need not use the "magic words `you are under arrest.'" State v. Mauer (1984), 15 Ohio St.3d 239, 255, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714. An individual is considered to be under arrest if he "is deprived of his movement by the state, he is in custody * * * [and] he could not have attempted to leave." Id. (Citations omitted.)
Here, there is no indication that police intended to arrest appellant. Appellant was stopped on his way to work by a police officer in a marked car and then voluntarily accompanied the officer to the police station. Appellant was not physically restrained in any way. At the station, Detective Zinser told appellant almost immediately "you're not under arrest * * * that door is open. You can leave whenever you want." It appears that appellant believed this to be true. Appellant asked to be returned to his car twice. In response, Zinser did not expressly deny appellant's request, but did continue to question appellant. Appellant eventually asked again, whereupon Zinser told appellant, "We can't keep you here, you're not under arrest." Shortly thereafter, the interview concluded, and appellant departed. Based on these facts, we conclude that appellant was not under arrest when he was interviewed by police on December 16, 1994.
Neither were appellant's Sixth Amendment right to counsel andFifth Amendment privilege to be free from self-incrimination violated when police continued to question him even after he made reference to an attorney. The United States Supreme Court has held that if a suspect requests counsel at any time during a police interview, the police must cease their questioning until a lawyer is made available or until the suspect himself initiates further conversation. Edwards v. Arizona (1981), 451 U.S. 477,484-485, 101 S.Ct. 1880, 1884-1885. The Court explained this rule in Davis v. U.S. (1994), 512 U.S. 452, 114 S.Ct. 2350, stating that if during police questioning a suspect makes reference to an attorney that is "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," Edwards does not require that the officer stop questioning the suspect. Id., 512 U.S. ___, 114 S.Ct. 2355. (Emphasis in original.)
Since Davis was decided, the following statements are among those which have been considered too equivocal to require police to stop their questioning: "It would be nice to have an attorney," Ledbetter v. Edwards (C.A. 6, 1994), 35 F.3d 1062,1070, certiorari denied (1995), ___ U.S. ___, 115 S.Ct. 2584; "I think I need a lawyer," State v. Henness (1997), 79 Ohio St.3d 53; "I feel like, talk to my, have my lawyer present," and "Well I mean, I'd still like to have my lawyer here," State v. Stover (Apr. 16, 1997), Lorain App. No. CA006461, unreported; and "I think I might need to talk to a lawyer," State v. Hanson (Sept. 13, 1996), Montgomery App. No. 15405.
In this case, appellant made three references to an attorney. Appellant's first reference to counsel was to ask police whether it would be "wise" to have an attorney. This question was not an unambiguous request for counsel. Appellant then raised a question about a form he was signing ("This says right here that I do not want a lawyer present at this time"), but, again, did not request an attorney. Finally, appellant stated, "I'd rather have my attorney here if you're going to talk stuff like that. I mean, if you're going to talk homicide and murder, I mean." While this statement expresses appellant's preference for an attorney, it falls short of the unambiguous request for counsel described in Davis ("the interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney"). Davis, 452 U.S. at ___, 114 S.Ct. at 2355. (Citations omitted.) (Emphasis in original.) The police interview of appellant did not infringe upon his constitutional rights. The first assignment of error is overruled.
In his second assignment of error, appellant states that the failure of his attorney to move to suppress the videotape at trial amounts to ineffective assistance of counsel. Again, we disagree.
In reviewing an ineffective assistance of counsel claim, an appellate court must apply the following test: 1) whether counsel's performance fell below an objective standard of reasonable professional competence, and 2) if so, whether there is a reasonable probability that counsel's unprofessional errors affected the outcome of the proceedings. Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064; State v. Lott (1990), 51 Ohio St.3d 160, 174, certiorari denied (1990),498 U.S. 1017, 111 S.Ct. 591. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.
Here, appellant has not shown that defense counsel's performance was deficient. Defense counsel's decision to refrain from moving to suppress the videotaped interview represents a reasonable tactical choice. In the videotape, appellant discusses Harris' death without implicating himself in her murder. Even more, he flatly denies killing her. With the videotape admitted in evidence, defense counsel was able to put these relatively favorable images of appellant before the jury without subjecting appellant to the uncertainties of cross-examination.
Moreover, in light of our decision with respect to the first assignment of error, there was no basis for defense counsel to file a motion to suppress. The Sixth Amendment right to effective assistance of counsel does not require defense counsel to file a motion to suppress evidence where none of the defendant's constitutional rights were violated. State v. Lott (1990),51 Ohio St.3d 160, 175; State v. Flors (1987), 38 Ohio App.3d 133,139. Appellant's second assignment of error is overruled.
Next we turn to appellant's third and fifth assignments of error in which he alleges that there is insufficient evidence to support his conviction and that the trial court erred by denying his Crim.R. 29 motion for judgment of acquittal.
Where an appellant challenges the sufficiency of the evidence, the reviewing court's function is:
 to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. (Citation omitted.)
Appellant was charged with murder in violation of R.C. 2903.02. In order to convict appellant, the state was obligated to prove that he: 1) purposely; 2) caused the death of another, e.g., Kristy Harris. R.C. 2901.22(A) provides:
 A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.
The findings of the two autopsies indicate that Kristy Harris was killed purposely. Harris had petechial hemorrhages in her lungs, larynx and face. These findings are consistent with asphyxiation. Dr. Lehman discovered that Harris had a bruised lower lip and a bruise in the center of her forehead. From these findings, Lehman concluded that Harris had been smothered, an act which can be inferred to be intentional. Lehman also testified that alcohol played no part in Harris' death, and that there was no obstruction in her windpipe, ruling out the possibility that she had been drinking and accidentally choked on her own vomit. Harris' torn fingernail suggests that she was involved in a struggle before she died. Finally, Lehman testified that Harris did not die where she was found. Instead, someone moved Harris after she was already dead, positioned her knee up in the air, and placed a liquor bottle in her hand. Such actions imply that a conscious effort was made to make Harris' death appear accidental.
When viewed in the light most favorable to the prosecution, the evidence presented by the state also tends to show that it was appellant who caused Harris' death. Appellant was shown by the evidence to be an angry, even volatile, individual. He and Harris argued frequently and, as demonstrated by the tape of their telephone conversation, appellant perceived Harris as trying to keep Destiny from him.
Appellant was the last person known to have seen Harris alive, and the first person to report her death only six hours later. Appellant has expressly denied killing Harris and has never directly implicated himself in her death. However, appellant's statements concerning the events that occurred between 3:00 a.m. and 9:00 a.m. on October 13, 1994 contain several inconsistencies that call his credibility into question. First, Paramedic Conneighton testified that when she spoke with appellant he told her "[t]hat they had gone out the previous night and they were downtown; they had argued; they had left and come home and continued to argue." Appellant told Conneighton that "he was just tired of arguing with her, so he had gone to bed and he assumed that she had left the premises." Appellant later told police that he and Harris "[d]idn't have nothin' to fight about," and that he and Harris were "getting along great" the night she died.
Appellant originally told police that he got up at about 9:00 a.m. He later told police he got up at 8:00 a.m., and did not discover Harris' car in the driveway until almost 9:00 a.m. when he called 911. However, two neighbors testified that they saw him in front of the house at 8:00 a.m. There was also testimony at trial that appellant moved cars in the driveway at Millie Mills' house sometime before 9:00 a.m.
Michelle Gray testified that she spoke with appellant, possibly waking him up, at 8:00 a.m. on October 13, 1994. According to Gray, appellant asked her to go out with him on Sweetest Day, Saturday, October 15, the date appellant and Harris had set for their wedding. Gray agreed, insisting, however, that Harris be moved out. Appellant responded, "Don't worry. She'll be gone by Saturday."
Appellant told police that he loved and respected Harris, but even while he was planning his marriage to Harris, he was continuing a romance with Gray. Gray testified that after they had been dating for several weeks, appellant called her to tell her that Harris had just been awarded custody of Destiny and that they (appellant and Gray) would have to stop seeing each other "because of Destiny." He also told Gray that he was leaving her to be with Harris, because "the only way he could see Destiny, is if he was with Kristy." Despite this turn of events, appellant called Gray occasionally, telling her that he missed her, and that he wanted to be with her and not with Harris. Appellant never told Gray that he was engaged to marry Harris.
The picture of appellant presented by Gray was of an individual who was about to marry a woman he did not love so that he could spend more time with his daughter. This portrayal was corroborated by the testimony of Joanne Trisler who described appellant's demeanor a few weeks before his wedding with Harris was to take place. Trisler observed that appellant was not enthusiastic. She stated, "Milly was, and Kristy were excited, but Don [appellant] was quiet, didn't really say a whole lot." In addition, according to Trisler, at the time Harris died appellant believed that he was one of two primary beneficiaries of a $15,000 life insurance policy on Harris.
Finally, the second autopsy of Harris indicated that Harris did not die accidentally, but that she was killed and then dragged or carried to the backyard. This theory is supported by several factors, including the presence of the blade of grass in Harris' lungs. The area where she was found was not grassy, but was bare dirt covered with leaves. In addition, Harris' purse, keys, and marriage license were found in her car in the driveway, suggesting that she had collected her belongings and had been about to leave Millie Mills' house when she was killed. The other occupants of the house — elderly Millie Mills and two-year-old Destiny Harris — were physically incapable of smothering or moving Harris, who weighed about one hundred eighty pounds. There is no evidence that any other person was in the vicinity of the Mills' house during the six hours from 3:00 a.m. until 9:00 a.m. Nor is there any evidence that Harris left the premises during that time. Harris' mother testified that the morning Harris was found dead, she saw long, deep scratches on appellant's forearms. A bottle from appellant's bedroom was found in Harris' hand.
The evidence tending to incriminate appellant is entirely circumstantial. However, it is well-settled that in the absence of direct evidence a defendant may be convicted on circumstantial evidence alone. State v. Nicely (1988), 39 Ohio St.3d 147, paragraph one of the syllabus. Therefore, we find that the evidence presented by the state, when viewed in a light most favorable to the prosecution, is sufficient to prove appellant guilty beyond a reasonable doubt and, thus, to withstand a Crim.R. 29 motion requesting a judgment of acquittal. Accordingly, the third and fifth assignments of error are overruled.
We proceed next to appellant's fourth assignment of error, in which appellant argues that his conviction is against the manifest weight of the evidence. In deciding whether a verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror." State v. Thompkins (1997), 78 Ohio St.3d 380,387.
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
The record in this case does not support reversal on a theory that the verdict is against the manifest weight of the evidence. We have already identified numerous conflicts in the evidence. However, the only reasonable resolution of those conflicts supports appellant's conviction. Thus, appellant's fourth assignment of error is overruled.
In his sixth assignment of error, appellant states that when the trial court denied his Crim.R. 29 motion, the burden of proof shifted to the defense. We have found that there was sufficient evidence to defeat a Crim.R. 29 motion and, thus, the state met its burden of proof. Accordingly, the sixth assignment of error is overruled.
In his seventh assignment of error, appellant alleges that remarks made by the prosecution during opening and closing arguments violated appellant's right to due process. Specifically, appellant complains of two statements. During opening argument, the prosecutor described the case as follows:
 * * * And what this case is about is who is the real Kristina Harris. Is State's Exhibit 1 the real Kristina Harris, a happy, perfectly healthy —
After defense counsel's objection to this characterization was overruled, the prosecutor used the word "wholesome" to describe Harris.
The test for reviewing opening statements is set forth in paragraph two of the syllabus of Maggio v. Cleveland (1949),151 Ohio St. 136, which states:
 Counsel should, of course, be accorded latitude by the trial court in making his opening statement, but when he deliberately attempts to influence and sway the jury by a recital of matters foreign to the case, which matters he knows or ought to know cannot be shown by competent or admissible evidence, or when he makes a statement through accident, inadvertence or misconception which is improper and patently harmful to the opposing side, it may constitute the basis for the ordering of a mistrial or for the reversal by a reviewing court of a judgment favorable to the party represented by such counsel.
In reviewing the complained of statement, we do not find that the prosecutor deliberately attempted to sway the jury by reciting matters which could not be proved by evidence. Nor do we find the remarks to be patently harmful, particularly since the jury was instructed that the opening remarks were not evidence. These remarks, therefore, do not constitute a basis for reversal.
Under this assignment of error, appellant also argues that the following statement made by the state during closing arguments constitutes reversible error:
 By Mr. Croswell's [defense counsel's] theory of what the law say, [sic] which is completely inaccurate, I could kill any one of you, put you in a house, burn the house down, destroy your body and then go to the police and say, I burned her up. But she was dead before I burned her up and there's no way in the world I can ever be convicted because nobody saw it and you'll never know how I killed her, so you can't convict me.
Again, defense counsel objected.
In closing argument, the prosecution is also entitled to some latitude. State v. Woodards (1966), 6 Ohio St.2d 14, 26, certiorari denied (1966), 385 U.S. 930, 87 S.Ct. 289. The test for prosecutorial misconduct in closing argument is "whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." State v. Smith (1984), 14 Ohio St.3d 13, 14. In this instance, we do not find that the prosecution's remarks were prejudicial to appellant. Instead, they appear to be nothing more than an attempt to explain to the jury the proposition we have stated above, i.e., that a conviction may be supported wholly by circumstantial evidence. Nicely. The seventh assignment of error is, therefore, overruled.
Finally, we turn to appellant's eighth assignment of error, which concerns the following colloquy during cross-examination of coroner Mehta:
 DEFENSE COUNSEL CROSWELL: * * * And when did you first talk to Mr. Hawkins?
 DR. ILA MEHTA: First, I talked to him before I started the autopsy.
CROSWELL: You talked to him?
MEHTA: Right.
 CROSWELL: Now Mr. Hawkins, in addition to being an investigator in the coroner's office, is also one of the chief prosecutor's [sic] in this County, isn't he?
 PROSECUTOR BREYER: Object, Judge, can we approach on that?
* * *
 CROSWELL: Pardon me, whether he's a prosecutor in this County and in —
 BREYER: — has nothing to do with it, what's the relevance?
MR. CROSWELL: It's got a lot of relevance.
MR. BREYER: What?
 THE COURT: I don't think it has any relevance either. The objection is sustained.
Appellant states that the trial court committed reversible error when it sustained the prosecution's objection on this point. Appellant argues that Mr. Hawkins' role as an assistant prosecutor is relevant because Dr. Mehta did not initially conclude that Harris' death was a homicide. Appellant appears to be arguing that Mehta's determination that Harris was the victim of a homicide was influenced by her discussions with Hawkins.
Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." The admission of evidence under this rule is a matter within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, 180. The trial court's decision should not be disturbed on appeal absent an abuse of discretion. State v. Blankenship (1995), 102 Ohio App.3d 534,549.
Here, we find no abuse of discretion by the trial court. Hawkins' affiliation with the state has no bearing on whether he influenced Dr. Mehta to change her findings concerning the autopsy. Moreover, Mehta's ultimate conclusion as to the cause of Harris' death was independently corroborated by Dr. Lehman's findings and testimony. The eighth assignment of error is overruled. Appellant's conviction is affirmed.
YOUNG, P.J., concurs.
KOEHLER, J., dissents.
[1] At the time of Harris' death, appellant, Harris, and their two-year-old daughter, Destiny Harris, lived with Millie Mills, appellant's mother.
[2] Millie was also indicted for and convicted of involuntary manslaughter in violation of R.C. 2903.04(A). After sentencing Mills to fifteen years to life for murder, the trial court dismissed the involuntary manslaughter conviction.