Defendant, David B. Clinkscale, testified that he was in his hometown of Youngstown, Ohio, when his childhood friend, Kenneth Coleman, was shot and killed. That same morning, Coleman's wife, Todne Williams, was shot three times in the head and arms. Williams subsequently identified Clinkscale as her assailant.
On September 29, 1997, the Franklin County Grand Jury returned an indictment charging defendant with three counts of aggravated murder, one count of attempted aggravated murder, one count of aggravated burglary relating to the Coleman/Williams' residence, separate counts of aggravated robbery relating to Coleman and Williams, and one count of kidnapping relating to Williams. Each count of the indictment included an associated firearm specification. Additionally, each of the aggravated murder counts included death penalty specifications.
On October 16, 1998, a jury found defendant guilty of each of the counts and specifications contained in the September 29, 1997 indictment. The trial court subsequently accepted the jury's recommendation and sentenced defendant to a single merged life term of imprisonment without the possibility of parole. Defendant now appeals, asserting the following four assignments of error:
 [1.] The court of common pleas erred and denied Defendant-Appellant his rights to the effective assistance of counsel and to due process and a fair trial guaranteed to him under U.S. Const. amend. V, VI, and XIV and Ohio Const. art. 1, § 10 and 16 when it denied his motion to discharge his appointed counsel on the ground that counsel negligently failed to timely file a notice of alibi and a disclosure of alibi witnesses. Alternatively, the failure of the court of common pleas to conduct an adequate investigation into the basis of Defendant-Appellant's dissatisfaction with the representation provided by his appointed counsel prior to ruling on his motion to discharge them was error and denied him his constitutional rights.
 [2.] The court of common pleas erred and denied Defendant-Appellant his right to due process and a fair trial guaranteed to him under U.S. Const. amend. V, and XIV and Ohio Const. art. 1, § 16
when it granted the State Ohio's motion to exclude the testimony of his alibi witnesses due to defense counsel's negligent failure to file a notice of alibi within the time requirements of Crim. R. 12.1.
 [3.] The improper and highly misleading remarks made by the prosecuting attorney during closing argument concerning latent fingerprint evidence, which remarks were not based upon testimony in the record and served to undermine a key theory of defense, rose to the level of plain error and violated Defendant-Appellant's right to due process and a fair trial guaranteed to him under U.S. Const. amend. V and XIV and Ohio Const. art. 1, § 16.
 [4.] Defendant-Appellant was denied his right to the effective assistance of counsel guaranteed to him under U.S. Const. amend. VI and XIV and Ohio Const. art. 1, § 10 based upon the following: (a) during the prosecution case, defense counsel failed to object to "other acts" evidence of Defendant-Appellant's possession of numerous firearms, and during the defense case, defense counsel actually elicited such evidence from Defendant-Appellant and thereby opened the door to damaging cross-examination on the same subject; (b) defense counsel failed to object to the improper and misleading comments made during the State's closing argument; (c) defense counsel failed to file a timely notice of alibi resulting in the exclusion of the third party corroborating alibi testimony; and (d) defense counsel failed to object to inadmissible hearsay testimony which improperly bolstered the in-court identification made by the sole eyewitness to the charged crimes.
Defendant and Kenneth Coleman were childhood friends who grew up together in Youngstown, Ohio. Coleman eventually left Youngstown and moved to Columbus. After relocating to Columbus, however, Coleman became heavily involved in gambling and the sale of illegal narcotics. Coleman operated at least two "crack houses" in the city and was known to carry firearms and large amounts of cash.
The events leading up to Coleman's murder began when Coleman invited defendant to join him at a dogfight on Saturday, September 6, 1997. Defendant accepted Coleman's invitation and arrived from Youngstown with his cousin, Jerome Woods, on the afternoon of Wednesday, September 3. Defendant and Woods checked into a hotel room that evening and met Coleman and one of his drug dealers, Pete Davis, at a nearby tavern. All four men met at another tavern the following evening, but did not meet again until the afternoon of Saturday, September 6.
At approximately 12:30 p.m., Saturday afternoon, defendant and Woods met Coleman, Davis, and another of Coleman's drug dealers, Gerry Joseph, at Coleman's home. Thereafter, the five joined four or five carloads of people and left for Cincinnati, Ohio. Upon arrival in Cincinnati, defendant, Woods, Coleman, Davis, and Joseph rented a single room at a hotel close to the location of the dogfight.
After dark, the five men left their hotel room for a barn located in rural Kentucky. The main event scheduled that evening was a fight in which Coleman had entered his dog. Soon after the fight began, Coleman accused the owner of the other dog of a rule infraction. Coleman's accusation apparently led to a heated argument between many of the individuals who had placed bets on the outcome of the fight. Ultimately, the dispute was resolved by a "gentlemen's agreement" between Coleman and the owner of the other dog, whereby the fight was cancelled, and all bets were refunded.
Apparently, Gerry Joseph was less than satisfied with the manner in which Coleman chose to settle his dispute with the owner of the other dog. He and Coleman subsequently became involved in their own argument, which ultimately prompted Coleman to refuse to allow Joseph to ride back to Columbus in his vehicle. As a result, Coleman and Davis drove back to Columbus while the other three men drove back in defendant's vehicle.
According to the defendant, he, Woods, and Joseph returned to Columbus at approximately 4 a.m. on Sunday, September 7, 1997. Defendant testified that after dropping Joseph off, he and Woods returned to their hotel and went to sleep for a short while. Defendant claims that at about 9 a.m., he and Woods checked out of their hotel room, went shopping, and then ate lunch. Thereafter, defendant and Woods left for Youngstown. Upon arriving in Youngstown, defendant claims to have met with his cousin, Brian Fortner, to watch an 8 p.m. football game. After the game, defendant testified that he spent the night with his girlfriend, Rhonda Clark. In short, defendant claims to have been in Youngstown, and not in Columbus, on the night Coleman was murdered.
The testimony of Coleman's wife, Todne Williams, directly contradicted defendant's testimony as to his whereabouts at the time of Coleman's murder. According to Williams, Coleman returned home early on the morning of Sunday, September 7, 1997. Upon his arrival, the two spoke briefly, and Coleman mentioned that defendant and Woods had planned to come over later that day to play a new video game defendant had purchased.
According to Williams, defendant and a friend, presumably Woods, did come over to meet Coleman later that Sunday. Williams testified that she recognized defendant from seeing him on numerous occasions when he had visited her husband. Soon after their arrival, defendant, Coleman, and the third man, began playing and placing bets on defendant's new video game. This continued well into the night and the next morning. Early that next morning, Williams awoke at approximately 1 a.m. and came down from her bedroom to get a bottle for her baby. When she did, Williams noticed that the defendant and his friend were still playing defendant's video game with her husband.
A short while after returning to her bedroom, Coleman came upstairs to retrieve money from a safe he kept in the bedroom closet. Coleman then went back downstairs, and Williams soon fell back to sleep. However, at about 3:45 a.m., Williams was awakened by the sound of gunfire. Williams testified that after hearing the first gunshot, defendant burst into her bedroom. According to Williams, defendant was armed with a pistol, was sweating profusely, and demanded that Williams show him where Coleman kept his money. Williams responded that he should ask her husband. However, defendant purportedly responded that it would not be possible to ask Coleman, and then yelled down for the third man to come upstairs. When the third man entered the room, defendant handed him the pistol and told him to watch Williams while he looked for the money.
Defendant eventually located Coleman's safe at which time he directed his partner to get the keys to his truck. Defendant then loaded the safe into the truck while his partner watched Williams. After loading the safe, defendant returned to the home and took back his pistol. As he did, he told the third man to get in the truck and that he would "take care of" Williams. After the third man left the house, defendant wiped off the front door handle and ordered Williams to lie on the kitchen floor next to Coleman's body. At that moment, Williams began to run for the backdoor and a scuffle ensued. During the struggle, defendant shot Williams in the face. Williams fell to the ground but managed to get up again. Defendant then shot Williams two additional times and then fled the residence.
After defendant left, Williams managed to place an emergency call to 911. Both the police and paramedics responded. Williams, who was bleeding profusely from her head and arms, was rushed to the hospital. During the process of securing the crime scene, the police found Coleman's body on the kitchen floor. The subsequent autopsy revealed that Coleman had died as a result of a single gunshot wound to the back of his head.
The core of defendant's appeal rests upon defendant's claim that he received ineffective assistance of trial counsel. In turn, this claim rests upon defense counsels' failure to timely file a notice of alibi and failure to object to the introduction of certain testimony. Although not in chronological order, each of defendant's assignments of error will be addressed below.
In his second assignment of error, defendant asserts that the trial court erred when it enforced Crim.R. 12.1 holding that defendant's notice of alibi had been untimely filed and, therefore, that testimony from defendant's proposed alibi witnesses was inadmissible.
Defendant filed a disclosure of his intent to present an alibi defense on October 6, 1998, after the jury had been selected and sworn, after jeopardy had attached, and immediately before the plaintiff began the presentation of its case. The Ohio Rules of Criminal Procedure require a written notice of alibi not less than seven days before trial. Crim.R. 12.1 provides that:
 Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his intention to claim alibi. The notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted.
It has been recognized for decades that the alibi notice requirement is meant to protect the prosecution from false and fraudulent claims of alibi, often presented by the accused so near the date of the trial as to make it nearly impossible for the prosecution to ascertain any facts as to the credibility of the witnesses called by the accused. State v. Thayer (1931), 124 Ohio St. 1,4. Sound reasons exist for the notice requirement. InWilliams v. Florida (1970), 399 U.S. 78, 90 S.Ct. 1893, the United States Supreme Court acknowledged:
 * * * Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate. Reflecting this interest, notice-of-alibi provisions, dating at least from 1927, are now in existence in a substantial number of States. The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. * * * [Id. 81-82; 1896.]
The Ohio Supreme Court has held that a refusal to enforce the alibi notice requirement, even in cases which include death penalty specifications, amounts to a tacit rejection of the concept of fairness for which the alibi notice requirement stands. See State v. Nooks (1930), 123 Ohio St. 190; and State v. Focht
(1974), 37 Ohio St.2d 173. However, because the notice requirement is based upon the fundamental concept of fairness, in some cases the interests of justice are served, and the trial court acts within the bounds of its discretion, when it admits alibi evidence despite the lack of timely notice.
The three-part test generally applied when faced with a request to exempt a defendant from the requirements of Crim.R. 12.1 consists of the following: (1) was the notice of alibi withheld by the defendant from the prosecution in bad faith; (2) does the newly asserted alibi evidence constitute a surprise or prejudice the prosecution; and (3) is the alibi evidence necessary to insure a fair trial? State v. Smith (1977), 50 Ohio St.2d 51. Stated alternatively, when the alibi evidence does not surprise or otherwise prejudice the prosecution's case, and when it is apparent that the defense acted in good faith, the exclusion of alibi evidence can constitute an abuse of discretion. Id.
The term "abuse of discretion" connotes more than an error of law or judgment; rather, a finding of abuse of discretion is tantamount to a finding that the court's attitude or decision making was unreasonable, arbitrary, or unconscionable. Blakemorev. Blakemore (1983), 5 Ohio St.3d 217; In re Jane Doe 1 (1991),57 Ohio St.3d 135. When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. Berk v. Matthews (1990), 53 Ohio St.3d 161, 169.
In this case, the trial court did not act arbitrarily or unreasonably when it enforced Crim.R. 12.1 and excluded testimony from defendant's proposed alibi witnesses. On two occasions the trial court thoroughly discussed with counsel the implications of defendant's failure to file a timely notice of alibi. The court began by noting that it had allocated funds well in advance of trial to enable counsel to conduct the investigation necessary to carry out the defendant's defense. Continuing, the court noted that defendant's case had been continued on a number of occasions, and that between four and six status conferences had been conducted. In its own words, the court stated:
 * * * I have continued this case a number of times, and as I indicated yesterday, I've had 4 or 5 or 6 status conferences, pretrials, and I think it's fair to say I have given everything to the defense that they have asked. * * * I'm at a loss, complete loss to know why this investigator comes up with this alibi on the 3rd of October, after the trial has begun, when I authorized money for investigation in this case in March, during which time the defendant's [sic] been in the Franklin County Jail available to you to speak to on a daily basis if you so desired. And between March and now the defendant has been in open court 5 or 6 times on different motions and hearings. And again, I reiterate what I said yesterday, when your are talking about an alibi, that couldn't be more unsophisticated. The alibi is simply that: I, the defendant, stayed overnight with a friend in Youngstown on the date in question. I have no information that indicates this friend has been difficult to locate. * * * This alibi, I reiterate, did not require any sophisticated testing with regard to blood, DNA, or anything like that * * *. So I have to question it being withheld in bad faith. I can't — I have been given no reason whatsoever, nor do I know of one why this couldn't have been verbally given by the defendant to counsel a long time ago. * * *
* * *
 * * * I am not talking about an alibi that was filed a little late, I'm talking about an alibi, as far as I know, is still not in my file. I'm talking about an alibi that I first got notice of the same day we impaneled the jury and jeopardy attached. I'm talking about a totally unsophisticated alibi that requires no particular investigation beyond a phone call to Youngstown, Ohio, no test, no scientific evidence, [and] no investigation * * *. [Tr. Vol. II, at 54-57.]
On the record, defense counsel stated only that the notice of alibi had been untimely filed due to the fact that their investigator had forwarded a report concerning his activities to counsel only three days prior to trial. We too have to question then, at a minimum, why counsel failed to file the notice of alibi that day or request an extension before jury selection began, and before jeopardy attached. Moreover, given the nature of his defense, it would seem almost impossible for defense counsel to conclude even their first meeting with the defendant without discussing defendant's claim that he was in Youngstown on the night that Coleman was murdered. Indeed, although defense counsel did not reveal to the court exactly when they became aware of defendant's alibi witnesses, counsel did state on the record that they had knowledge of the witnesses before the report of the investigator was ever concluded.
 THE COURT: Why didn't you file a Notice of Alibi when you found out about it? * * *
 [COUNSEL]: Your Honor, I don't recall the exact date, but in all candor to the court, I'm not going to sit here and suggest I just found out yesterday.
THE COURT: I'm sorry?
 [COUNSEL]: I don't recall the exact date, but I'm not going to sit here and suggest to the court in all candor that I just found out yesterday. That would not be the case. [Tr. Vol. II, at 61-62.]
Given the foregoing, we are unable to agree with defendant's claim that the trial court erred when it found strong evidence suggesting that the notice of alibi had been withheld at least knowingly and perhaps in bad faith.
As for the second prong of the test, we believe that the last minute request to allow the testimony of defendant's friend and girlfriend both surprised and prejudiced the prosecution. As set forth by counsel for the state, the prosecution had no notice of alibi, no opportunity to interview or investigate defendant's proposed alibi witnesses, and was prejudiced by the apparent tactics of defense counsel as to the alibi defense. Specifically, counsel had fully prepared the state's case and trial strategy while under the impression that defendant did not plan on calling alibi witnesses. Thus, at an absolute minimum, the prosecution would have required a significant continuance in order to conduct last minute investigation and discovery pertaining to the defendant's alleged alibi witnesses.
However, prior to defendant's disclosure, the parties and the court had completed the arduous process of empanelling a jury in a capital murder case. Because defendant waited until after jeopardy attached, the court was unable to postpone jury selection in order to grant the prosecution a continuance without unduly burdening the members of the jury. Moreover, having readied defendant's case for trial, the court had cleared its calendar of other matters which could have received its attention and, thus, would have unnecessarily delayed justice to other litigants who were ready to proceed to trial.
We find the facts presented in this case parallel those in State v. Smith (1985), 17 Ohio St.3d 98, wherein the Ohio Supreme Court upheld rejection of alibi evidence in an aggravated robbery prosecution. In Smith, the Supreme Court found that the prosecution was unaware of the identity of the alibi witness and had no opportunity or motive to question those witnesses such that it would have suffered prejudice by the introduction of the defendant's alibi testimony. Id. at 104.
Although no formal hearing to establish counsel's reasons for noncompliance with Crim.R. 12.1 was held in Smith, in this case the court allowed counsel on two different occasions to argue the matter. Therefore, the facts of this case are more compelling than those in Smith where the court disposed of the defendant's claim noting that:
 Counsel is required to consult with his client on important trial decisions. The record is devoid of any suggestion that counsel failed to communicate this tactic to the appellee. Thus, we assume that the appellee chose to disregard the notice-of-alibi rule, having the potential concomitant effect of depriving the state of a fair trial. If indeed the appellee's choice was based upon the advice of counsel, his claim must be directed to the advisability of the strategy. We are ever-mindful of the great latitude given counsel in matters of trial strategy. We are also cognizant of the possibility, however remote, that the appellee was not informed of this strategy. In either event, the appellee is entitled to pursue the matter by means of postconviction relief pursuant to R.C. 2953.21, et seq. [Id. at 101, fn. 1.]
Although given ample opportunity to do so, defense counsel offered no explanation for why defendant's notice of alibi had not been filed within the minimum requirements of Crim.R. 12.1. Again, although noting that counsel had been aware of these witnesses, counsel did not state that their failure to disclose those witnesses had been a tactical decision, had been a result of circumstances outside their control, or had constituted mere oversight or neglect. As the prosecution had no notice of defendant's intent to present an alibi defense, no opportunity or reason to conduct an investigation and discovery in regard to defendant's proposed witnesses, and in light of the fact that defendant waited until jeopardy attached, we are unable to conclude that the trial court erred when it enforced the rules of criminal procedure. Defendant's second assignment of error is, accordingly, overruled.
In his first assignment of error, defendant claims the trial court erred when it denied his motion to discharge his court-appointed counsel. The Ohio Supreme Court has ruled that "[t]o discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." State v. Henness (1997), 79 Ohio St.3d 53,65, quoting State v. Coleman (1988), 37 Ohio St.3d 286.
Immediately after the trial court made its final ruling excluding defendant's alibi witnesses, defendant stood and addressed the court saying:
 * * * I'm questioning that my witnesses and the preparation of my case was not properly submitted at the right time. And I feel that being that it was not presented at that right time, that I should be able to be allowed to get proper counsel that can get all my paperwork and all the things that my defense should be properly stated. [Tr. Vol. II, at 73.]
In Henness, supra, the Supreme Court noted marked "personal differences" between the defendant and one of his appointed attorneys. Specifically, the court record reflected that the defendant had claimed that counsel had pursued strategies against his wishes, lied to him, given bad advice, and violated the attorney-client privilege. The defendant referred to his attorneys as "clowns," and appointed counsel acknowledged that a great deal of hostility and tension existed between counsel and client. Although the court stated that it was "clear" that hostility existed between counsel and client, it went on to find that neither the personality conflict nor the attorney's representation had been eroded to the point of rendering the attorney's representation ineffective.
There is no indication in this case that the attorney-client relationship between defendant and his appointed counsel had deteriorated or become compromised. Defendant did not allege that he had been unable to communicate with appointed counsel, nor did defendant indicate that any conflict of interest existed with counsel. Rather, defendant voiced his dissatisfaction with the court's ruling in regard to his alibi defense. Defendant's dissatisfaction with the court's ruling, however, is insufficient to obtain relief under Henness. Accordingly, the trial court correctly denied defendant's motion to discharge counsel. The first assignment of error is, accordingly, overruled.
In his third assignment of error, defendant claims that remarks made by the prosecution during closing argument amounted to plain error. Specifically, defendant cites the following portion of the transcript taken during the course of the prosecution's closing argument:
 You heard defense cross-examine detectives and the print people, the latent lift people that there were prints of value that they didn't check. Did you specifically check Pete Davis' or G-man's? Came in here, they are trying to insinuate Pete Davis and G-man were in there, that they perhaps killed him.
 You heard the latent lift examiner testify about a machine called AFIS. It's an automated fingerprint system. And that machine, she said people in Franklin County, Pete Davis, G-man are from, G-Money are from, takes all the prints of all those people in that computer in Franklin County and runs them automatically. Nothing hit. Pete Davis' prints didn't come up and G-man's didn't come up. G-Money's prints didn't come up. So through AFIS their prints were crossed and they didn't come up. [Tr. Vol. VI, at 960-961.]
The test for prosecutorial misconduct during the course of closing argument is whether the remarks were improper, and, if so, whether they prejudicially affected substantial rights of the accused. State v. Smith (1984), 14 Ohio St.3d 13, 14. As defense counsel failed to object to the foregoing argument, the comments made must amount to plain error. State v. White (1998), 82 Ohio St.3d 16,22.
In order to determine whether a prosecutor's remarks are prejudicial to the accused, the entire closing argument must be reviewed. State v. Keenan (1993), 66 Ohio St.3d 402, 410. Keeping in mind that both the prosecution and defense have wide latitude in closing arguments as to what the evidence has shown and what inferences may be drawn therefrom, under a plain error analysis we are unable to agree that the foregoing remarks are of such a magnitude as to require reversal. State v. Lott (1990),51 Ohio St.3d 160, 165. Stated alternatively, when reviewed in context, the prosecutor's remarks, even if improper, do not rise to the level at which we could find that the defendant would not have been convicted in the absence of those remarks. See State v.Tumbleson (1995), 105 Ohio App.3d 693, 700. Accordingly, defendant's third assignment of error is overruled.
In his fourth and final assignment of error, defendant maintains that he received ineffective assistance of trial counsel in violation of his rights under the Ohio and United States Constitutions.
In order to succeed upon his claim of ineffective assistance of counsel, defendant must show both that his counsel's representation was flawed and that he suffered material prejudice as a result thereof. Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 2064. We note the presumption echoed by the United States Supreme Court in Strickland, that a properly licensed attorney is presumed competent. As such, judicial scrutiny of a trial attorney's performance is appropriately deferential. Id.
As the United States Supreme Court noted in Strickland, "[t]here are countless ways to provide effective assistance in any given case." Id. at 689; 2065. As such, the essential question is whether counsel acted "outside the wide range of professionally competent assistance." Id. at 690; 2065. Thus, the defendant's burden when asserting a claim of ineffective assistance is to show that "there exists a reasonable probability that, were it not for counsel's errors, the result of trial would have been different."State v. Bradley (1989), 42 Ohio St.3d 136. Stated differently, the crux of a claim of ineffective assistance of counsel is not to improve the quality of otherwise adequate legal representation.Strickland, at 689; 2065.
Defendant's first claim of ineffective assistance relates to the failure of trial counsel to object to testimony that two handguns had been confiscated from defendant's Youngstown residence at the time of his arrest, and testimony that defendant had been stopped in his vehicle while out on bond at which time another handgun was confiscated.
In this case, defendant took the witness stand and testified in his own defense. In the course of doing so, defendant was forthcoming about the details of his arrest and subsequent traffic stop. Given the fact that defendant testified and was thereby subject to examination by the prosecution, it would seem prudent trial strategy to directly and openly address the fact that handguns were confiscated from his possession in order to dispel or prevent the prejudicial impact which would occur if that information were elicited on cross-examination. Additionally, part of the defense strategy in this case was geared toward demonstrating the violent nature of Coleman and his associates, and that defendant had armed himself against possible retaliation by Coleman's friends. Significantly, counsel clearly demonstrated that none of the weapons found in the defendant's home or vehicle fired the shots which killed Coleman and injured Williams. Moreover, defendant testified that he feared retaliation from Coleman's associates.
Under the circumstances of this case, we are unable to find that a reasonable possibility exists that the result of defendant's trial would have been different if counsel had attempted to suppress this information. We again repeat the court's finding in Strickland that "[t]here are countless was to provide effective assistance in any given case." Id. at 689; 2065. In this case we find counsel's strategy to be one of many sound approaches given the nature of this case.
In his second claim, defendant argues that counsel was ineffective because counsel did not object to the above-cited portion of the prosecutor's closing argument. Applying the applicable standard, we are also unable to find that a reasonable probability exists that the result of this trial would have been different had defense counsel lodged an appropriate objection. Stated alternatively, although we can think of no strategic reason behind failing to object to portions of the prosecutor's closing argument, which are not fairly based upon the evidence introduced at trial, here it does not appear reasonable, or even probable, that the result of this trial would have been different had the appropriate objection been lodged.
In his third claim, defendant maintains that counsel were ineffective for not timely filing defendant's notice of alibi. As noted, counsel did clearly indicate that they were aware of the alibi witnesses before the disclosure deadline set forth in Crim.R. 12.1; however, the record contains no explanation of the reason behind the late disclosure. For example, the record does not disclose whether trial counsel failed to investigate or to interview defendant's alleged alibi witnesses. As a result, we are unable to reach a determination as to whether the delay was the result of trial strategy or was due to counsel's ineffectiveness as alleged. As the reason for the late disclosure is not a part of the record before this court, defendant must pursue his claim of ineffective assistance based upon the late disclosure by way of a motion for postconviction relief.
In his fourth and final claim, defendant asserts that defense counsel were ineffective because they failed to object to hearsay testimony. Specifically, defendant points to counsel's failure to object to testimony given by Coleman's mother regarding a telephone call made by Todne Williams from the hospital emergency room immediately after the shooting. Defendant also points to counsel's failure to object to testimony that the Youngstown Police Department purportedly identified Jerome Woods as a "known associate" of the defendant.
Having considered defendant's arguments, we are unable to find that there exists a reasonable probability that, were it not for counsel's decision not to object to those portions of the testimony, the result of this trial would have been different. Accordingly, defendant's fourth assignment of error is overruled.
For the foregoing reasons, all four of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
BRYANT and DESHLER, JJ., concur.