[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Erie County Court of Common Pleas. There, following the return of a jury verdict appellant was convicted and sentenced on charges of aggravated burglary, tampering with evidence, felonious assault, and aggravated robbery, with a gun specification. Because we conclude that all the convictions were proper, we affirm.
{¶ 2} Appellant, Gerald Haskins, was indicted by the Erie County Grand Jury on the following counts: aggravated burglary in violation of R.C. 2911.11(A)(2); burglary in violation of R.C. 2911.12(A)(2); tampering with evidence in violation of R.C. 2921.12(A)(1); felonious assault in violation of R.C. 2903.11(A)(2); aggravated robbery in violation of R.C. 2911.01(A)(1) with a gun specification; and robbery in violation of R.C. 2911.02(A)(2). The indictment stemmed from two separate incidents occurring on May 26, 1999. Appellant pled not guilty. After conducting a hearing, the court denied appellant's motion to suppress certain evidence. On the morning of trial, appellant requested a different attorney, claiming that his counsel was not representing him as he desired. After a lengthy inquiry, the trial court denied appellant's request.
{¶ 3} At trial the following evidence was presented. Edith Neumeyer testified that she was employed as an attendant at a Sandusky, Ohio gas station. On May 26, 1999, at approximately 6:30 a.m., a younger, black male customer (later identified as appellant) entered the store. Appellant wandered nervously around as if he did not know what he wanted. A customer who was already in the store paid for items and left. Appellant then purchased a bottled soft drink, but indicated that he wanted something else. Another customer entered the store, made a purchase and left. Appellant then came to the counter with a packaged sweet roll and handed Neumeyer a $5 bill. As she rang up the sale and handed him his change, he told the clerk to give him the money in the drawer. According to Neumeyer, appellant's face was only about a foot away from her at this time. Neumeyer thought appellant was initially joking. Appellant then stated "Are you going to give me the money or do I have to pull this pistol out of my pocket?" Neumeyer did not see a gun, but immediately raised her hands.
{¶ 4} Neumeyer then opened the drawer and placed the cash tray on the counter. Appellant took the money, leaving the soft drink bottle and sweet roll on the counter. He then ran out of the store and down the street.
{¶ 5} Neumeyer called police who seized a security videotape which had been running during the robbery. Later that day, Neumeyer went through several mugshot books. Although she picked out appellant and one other as possible suspects, she would not confirm either, stating that she did not want to accuse the wrong person. Several days later, she looked at a photo lineup provided by police and positively identified appellant as the alleged robber, stating that she recognized him by his eyes. At trial, she reiterated that she was 100 percent sure that appellant was the person who had robbed the gas station.
{¶ 6} Sandusky Police Officer Ken Nixon testified that when he talked to Neumeyer at the gas station, she had described the robber as a bald, black male, approximately five feet six inches tall, wearing a black t-shirt and dark pants. He further stated that sometime later, he and Neumeyer had viewed the video tape taken from the security camera. Nixon also said that the soft drink bottle and roll package were fingerprinted, but no prints were found which matched appellant's.
{¶ 7} The next witness, Mary Buser, testified that she lived on 48th Street in Sandusky, Ohio. On May 26, 1999, shortly after 11:00 p.m., she was sitting in her living room watching television. The front door was open and the screen door was unlocked. Buser testified that a man, later identified as appellant, opened the screen door and stuck his head through the doorway. He then entered the home and walked towards Buser with a knife in his hand. Buser stated that the knife blade was eight to ten inches long. She also testified that he wore a dark, triangular fabric with ties that masked his nose and bottom half of this face. Buser said she stayed focussed on his eyes. His head was covered with what she thought was a bandana. Buser could not, however, positively identify a bandana taken from appellant as the same one.
{¶ 8} Buser testified that she first stood up when appellant entered the home, but fell back into a recliner chair. According to Buser, as appellant came closer, she kicked at his chest six to eight times. She also screamed for her husband who was upstairs showering. She stated that the living room was brightly lit and she kept eye contact with the intruder during the entire incident. Appellant then ran out the front door, heading east down the street. Buser turned on the porch light and followed him. She then retreated to her home, shut the door, and called police. Buser described the intruder as a black male, five feet nine to ten inches tall and weighing 145 pounds. She said he was wearing a dark charcoal gray knit shirt.
{¶ 9} A short time later, police brought appellant back to Buser's residence in a police car. She stood in her darkened garage as appellant got out of the cruiser and was illuminated by the headlights. Although appellant was shirtless and turned his face away from her, she stated that he appeared to be the same size and build as the person who had entered her home.
{¶ 10} Later, Buser was asked by police to look at a photo lineup. She refused to look at the first line up, because she could see that only one photo showed a man without a shirt. The police then masked the photos from the top of the nose down, in an attempt to simulate the intruder's face as seen by Buser. Buser positively identified appellant from this line-up, indicating that she recognized his eyes. She also identified appellant in court as the intruder.
{¶ 11} Buser stated that the next morning, her family searched the neighborhood for any evidence related to the break-in. About four blocks from the house, a Buser family member found a knife in the grass, about one and one-half feet from the sidewalk. The blade length of the knife matched the one held by the intruder. Buser called the police who retrieved the knife from the Columbus Avenue location where it was found.
{¶ 12} Next, Amanda Miller testified that, around 11:00 p.m. on the night of May 26, 1999, she and a friend were sitting in a car parked just down the street from Buser's home. They were waiting in front of the house of another friend, Krista, for her return home. Miller and her friend noticed a black male smaller to medium build with very little or no hair walking on the street toward her car. She described him as wearing dark pants with a slightly lighter shirt. Miller was suspicious because he walked around slowly for about ten minutes. Miller stated that he walked towards her car and crossed to the other side of the street. He then walked on the sidewalk away from her car and crossed back to her side of the street in mid-block. Miller observed the man re-crossing back and forth about four times. She testified that he then left the sidewalk on her side of the street and walked up between the houses near the Buser home. About three minutes later, Miller saw a porch light come on and the same man "sprinted" out from the house into the middle of the street. He ran towards her car and then towards Hancock Street and 42nd Street.
{¶ 13} When Krista arrived home shortly after this, Miller told Krista's parents about the events she had witnessed. At the parents' suggestion, Miller walked down to the Buser residence and told police what she had observed. When officers brought appellant to the scene, she saw him acting very restless, in the back of the cruiser. She told police that from the "clean head," his build, color of his skin, and dress, he matched the description of the man she had just seen. Miller noted that she had not seen his facial features and the man in the cruiser did not have a shirt on. Nevertheless, at the time of the incident, she was certain he was the same man who ran from the Buser porch. Miller further identified appellant in court as fitting the description of the man she had seen that night.
{¶ 14} Officer Ted Youskievicz testified that he picked up a kitchen knife from the location on Columbus Avenue. No fingerprints were found on the knife which was reportedly found by Mrs. Buser. In his report, he had described the knife as having a 33.5 inch length and a 21 inch blade. Noticing that the knife was not that long, he explained the discrepancy by noting that he had used a metric ruler and mistakenly written the measurements in inches instead of centimeters.
{¶ 15} Officer Jose Garcia testified that he answered a dispatch call on the evening of May 26, 1999 and was sent to the Buser residence. En route to the home, he was traveling nearby on Columbus Avenue and saw a black male wearing dark clothing and a bandana running "full tilt." Since the man fit the description of the intruder, Garcia decided to turn around and stop him. Garcia stated that he pulled into a driveway in front of appellant's path. Appellant ran around his cruiser and continued on. At Garcia's request, appellant then stopped. Garcia noted that appellant, who did not have a shirt on, was sweating heavily, winded, and "had the Adrenalin going." When asked where he had com from, appellant indicated he had been dropped off by some friends at Columbus and Perkins Avenues. He eventually stated that he was dropped off by a person named Mike, last name unknown. Appellant also said he was looking for a girl's house, but didn't know her name or her address. Garcia conducted a pat down and found a gray, two-tone bandana in one pocket and a bent metal coat hanger in another. When asked what the hanger was for, appellant replied, "You know what that's for." Garcia said that the implication was that it was for cleaning out a marijuana pipe or for breaking into cars. Garcia then told appellant that he was not under arrest, but was being detained briefly for more information. Garcia placed appellant in the back of the cruiser and transported him to the Buser residence. After Mrs. Buser initially identified him, appellant was Mirandized, placed under arrest, and taken into custody.
{¶ 16} Garcia testified that officers searched the area near the Buser house to locate a knife or a shirt. Nothing was found. He also stated that he spoke with Amanda Miller and her friend who had been sitting in the car prior to the incident. He corroborated that their vehicle was parked approximately two houses from the Buser residence. He put spotlights on the cruiser and had Amanda look at appellant who was seated in back. Amanda identified appellant as the man she had seen walking on the street earlier.
{¶ 17} Garcia testified that he did not know if he had a video camera in the cruiser. He noted that appellant had told another officer that he had been dropped off by the post office — a different location. He also stated that appellant was approximately five feet nine inches in height.
{¶ 18} The next witness, Officer James G. Fitzpatrick, testified that he was dispatched to the Buser residence with a description of the suspect at about five feet eight inches tall, 160 pounds. When he arrived at the home, he talked with the victim, Mary Buser, who described what had happened. Fitzpatrick essentially corroborated Buser's testimony. Fitzpatrick recalled that Buser said that the intruder had a "mask" over his face. He also said he secured the residence, making sure no one was hiding near the house. Officer Garcia then advised him that he was bringing a suspect he had picked up nearby. Fitzpatrick identified appellant as that suspect brought to the scene. Fitzpatrick also testified that he spoke with Amanda Miller and her friend, Kelly McCormick, who described what they had observed prior to the incident. He then stated that he had appellant step out of the cruiser and shone lights on him. Amanda positively identified him as the person she saw leaving the Buser home.
{¶ 19} Officer Fitzpatrick also noted in his report that, on the evening of the incident, Mrs. Buser indicated that appellant was five feet eight or nine inches, 150 pounds, and that she kicked appellant twice in the chest. He also stated that he had used the term "bandana of sorts" even though Buser had said "mask" and never actually used the word "bandana" to describe the material over the intruder's face. Fitzpatrick also showed the first photo line-up to Buser. He stated that the second one used to identify appellant, the exhibit presented at trial, was the same set of photos, only with the bottom halves of the faces covered.
{¶ 20} Detective John Orzech then testified that he tried to retrieve the tape of the 911 call from the Buser home. He stated that the tapes are recycled every four to five months. Therefore, the tape from this call had been taped over in October. He also confirmed that he had conducted fingerprint testing on the soft drink bottle and roll wrapper, but had not found any complete prints to enable a positive identification. Orzech also stated that the knife had no detectable prints.
{¶ 21} At this point in the trial, the videotape from the security camera at the gas station was played for the jury. In Detective Orzech's opinion, the tape showed photos depicting appellant robbing the gas station. Orzech also testified that another officer feeds information into a computer which then generates photos for use in line-ups. He noted that in picking photos, officers try to get an array with physical characteristics which are as similar as possible. Orzech testified that Neumeyer looked carefully at all the photos before positively identifying appellant.
{¶ 22} Orzech was also involved with the photo line-up shown to Mrs. Buser. When she indicated that she could not see the intruder from the tip of his nose down, he covered up all the faces to reflect that fact. He stated that Buser then selected appellant's picture, recognizing what she called his "soulful" eyes.
{¶ 23} Detective Helen Prosowski then testified that appellant told her during an interview that on the Thursday prior to the robberies, he had been in Port Clinton, Ohio drinking beers at a local bar. He said he had met a group of white males and females who talked about going to a bar in Sandusky. Appellant stated that the next thing he remembered was waking up in the Erie County jail. He also told her that he worked Monday through Friday as a painter for a man named Willy, but could not give a last name.
{¶ 24} The state then rested. Appellant offered no evidence in defense. The jury found appellant guilty on all six counts. Appellant was sentenced as follows: nine years incarceration as to Count 1, aggravated burglary with a physical harm specification (burglary merged); three years incarceration as to Count 3, tampering with evidence; six years incarceration as to count 4, felonious assault; and nine years incarceration as to Count 5, aggravated robbery (robbery merged), plus three years actual incarceration for the firearm specification. The sentence for Count 1 runs concurrent to those in Counts 3 and 4; the sentence in Count 5 shall run consecutively to the sentence in Count 1. The firearm specification is to be served prior to and consecutively to Counts 1, 3, and 4, which are concurrent, and to Count 5, for a total of 21 years.
{¶ 25} Appellant now appeals that conviction, setting forth the following eight assignments of error:
{¶ 26} "I. Defendant's conviction for aggravated robbery was legally insufficient.
{¶ 27} "II. Defendant's conviction for the offense of aggravated robbery was against the manifest weight of the evidence.
{¶ 28} "III. Defendant's conviction for the gun specification attached to the indictment (2941.145) was legally insufficient.
{¶ 29} "IV. Defendant's conviction for the gun specification attached to the indictment (2941.45) was against the manifest weight of the evidence.
{¶ 30} "V. Defendant's conviction for aggravated burglary was against the manifest weight of the evidence.
{¶ 31} "VI. The defendant was materially prejudiced by ineffective assistance of counsel when defendant's first counsel waived defendant's right to a preliminary hearing without his knowing consent and failed to obtain potentially exculpatory evidence in a timely fashion before said evidence was destroyed.
{¶ 32} "VII. The trial court erred when it disallowed defendant to fire his attorney and forced defendant to proceed to trial with his attorney, after defendant voiced reasonable concerns regarding his attorney-client relationship.
{¶ 33} "VIII. The trial court erred when it imposed consecutive sentences upon the defendant because consecutive sentences were disproportionate to the crimes involved."
 I.
{¶ 34} We will address appellant's first and second assignments of error together. Appellant argues that his conviction for aggravated robbery was legally insufficient and was against the manifest weight of the evidence because no gun was ever seen or found.
{¶ 35} The Supreme Court of Ohio has ruled that "the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id at 386. Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. If a defendant's conviction is reversed based upon the sufficiency of the evidence, the defendant's conviction is reversed, with prejudice. Thompkins, supra at 387.
{¶ 36} However, under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Thompkins, supra at 387. The appellate court,
{¶ 37} " `reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
{¶ 38} R.C. 2911.01(A)(1) provides:
{¶ 39} "No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
{¶ 40} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."
{¶ 41} Proof of the existence of a deadly weapon does not require that the state actually come into possession of the weapon — the fact required to be proved may be inferred from other evidence. See State v. Boyce (1985), 21 Ohio App.3d 153, 154; State v. Vondenburg (1980),61 Ohio St.2d 285, 288 (where credible evidence establishes gun used in robbery and gun is not available for testing, unnecessary to prove that the gun could actually fire a projectile to sustain conviction for aggravated robbery).
{¶ 42} In this case, the attendant in the gas station robbery testified that appellant threatened "Are you going to give me the money or do I have to pull this pistol out of my pocket?" The attendant responded immediately by putting up her hands, fearing that appellant did, in fact, have a gun. Although no weapon was actually seen or found, credible evidence was presented from which the jury could have found beyond a reasonable doubt that appellant did, in fact, have a deadly weapon on or about his person or under his control. Therefore, sufficient evidence was presented going to all the elements of the crime and the conviction was not against the manifest weight of the evidence.
{¶ 43} Accordingly, appellant's first and second assignments of error are not well-taken.
 II.
{¶ 44} Appellant next argues, in his third and fourth assignments of error, that his conviction for the gun specification pursuant to R.C.2941.145 was legally insufficient and against the manifest weight of the evidence.
{¶ 45} A firearm specification is proven when it is established that the "* * *offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense * * *." R.C. 2941.145(A) "Firearm" is defined as "* * * any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. `Firearm' includes an unloaded firearm, and any firearm which is inoperable but which can readily be rendered operable." R.C. 2923.11(B).
{¶ 46} In order to enhance a sentence pursuant to a firearm specification statute, the state must present evidence that a firearm existed and was operable at the time of the offense. See State v. Murphy (1990), 49 Ohio St.3d 206, 208. "However, such proof can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." Id. at syllabus; State v. Gaines (1989), 46 Ohio St.3d 65. This evidentiary standard was broadened even further in State v. Thompkins (1997), 78 Ohio St.3d 380. In Thompkins, the Supreme Court of Ohio held that, in determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm. Thompkins, supra, at paragraph one of the syllabus. Thus, the existence and operability of a firearm may be proved by threats, explicit or implicit, made by the person in control of the firearm.
{¶ 47} In this case, appellant indicated that he would use the "pistol in my pocket" if the attendant did not give him the cash drawer money. Although no firearm was actually visible to the victim or found, the effect on the hearer was that appellant had a firearm and threatened to use it. Thus, we conclude that appellant's explicit threat, when construed most strongly in favor of the state, provides sufficient evidence from which any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
{¶ 48} We further conclude that, although not visible, the threat of the use of a firearm is, under Thompkins, enough for a jury to find that appellant did, in fact, have an operable firearm. Therefore, we conclude that sufficient evidence was presented to sustain the conviction for the R.C. 2941. 145 firearm specification and the verdict was not against the manifest weight of the evidence.
{¶ 49} Accordingly, appellant's third and fourth assignments of error are not well-taken.
 III.
{¶ 50} Appellant, in his fifth assignment of error, contends that his conviction for aggravated burglary was against the manifest weight of the evidence.
{¶ 51} R.C. 2911.11(A)(2) provides that:
{¶ 52} "No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
{¶ 53} "* * *
{¶ 54} "(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."
{¶ 55} In this case, testimony was presented that appellant entered the Buser residence while two occupants were present. Further testimony was presented that, while holding a knife, appellant approached Mrs. Buser in a threatening manner. Mrs. Buser identified appellant as the man who was in the house. Amanda Miller positively identified him as the man running from the house. Therefore, we conclude that the jury did not clearly lose its way since there was competent, credible evidence to support the conviction.
{¶ 56} Accordingly, appellant's fifth assignment of error is not well-taken.
 IV.
{¶ 57} Appellant, in his sixth assignment of error, claims that he was not afforded effective assistance of counsel. Appellant argues that his first counsel waived his right to preliminary hearing without his consent and failed to get evidence of a 911 tape and a police cruiser videotape which may have been exculpatory.
{¶ 58} In order to prove ineffective assistance of counsel, a defendant must show 1) that defense counsel's representation fell below an objective standard of reasonableness and 2) that counsel's deficient representation was prejudicial to defendant's case. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. See also Strickland v. Washington (1984), 466 U.S. 668, 694.
{¶ 59} In the present case, appellant's signature appears on a waiver of preliminary hearing form, dated June 9, 2000. Nothing in the record indicates that appellant disputes that the signature was his or that he did not understand what he was signing. Additionally, during the court's inquiry just prior to trial, the state disclosed that no cruiser video had ever existed. The only remaining issue is initial counsel's failure to obtain a 911 tape from May 26, 1999, which was taped over. It is unclear from the record whether appellant was referring to the call pertaining to the gas station robbery or the residential burglary. Even presuming, however, that appellant's first counsel could have gotten this tape, appellant has not demonstrated that the tape included any exculpatory information. The officers testified as to the descriptions given by dispatch at the time of both incidents. These descriptions came from information provided by the 911 calls. The slight discrepancies in descriptions may be reconciled, especially with the positive identifications given by the victims. Therefore, in our view, appellant has failed to show that counsel's actions fell below the reasonable standard of care or, even presuming such a deficiency, that any prejudice occurred which would have caused reversible error.
{¶ 60} Accordingly, appellant's sixth assignment of error is not well-taken.
 V.
{¶ 61} Appellant, in his seventh assignment of error, contends that the trial court erred in not permitting him to discharge his court appointed counsel on the day of trial.
{¶ 62} "An indigent defendant has a right to competent counsel, not a right to counsel of his own choosing." State v. Blankenship (1995), 102 Ohio App.3d 534, 558, citing Thurston v. Maxwell (1965),3 Ohio St.2d 92, 93. There is no constitutional right to a "meaningful attorney-client relationship." Morris v. Slappy (1983), 461 U.S. 1,13-14. "Rather, an indigent defendant is entitled to the appointment of substitute counsel only upon a showing of good cause, such as conflict of interest, a complete breakdown in communication, or an irreconcilable conflict which leads to an apparently unjust result." Blankenship,102 Ohio App.3d at 558.
{¶ 63} To discharge a court-appointed attorney, the defendant must demonstrate to the court justifiable cause for both the discharge of the appointed counsel and the request for appointment of new counsel. See State v. Edsall (1996), 113 Ohio App.3d 337, 339. The existence of "hostility and tension" or "personal differences" which do not rise to the level of interfering with the preparation or presentation of a defense are not sufficient to justify discharging court-appointed counsel. See State v. Henness (1997), 79 Ohio St.3d 53, 65-66. A trial court's decision regarding a request for new counsel is governed by an abuse of discretion standard. State v. McNeill (1998), 83 Ohio St.3d 438,452. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
{¶ 64} In this case, appellant asked for new counsel on the morning of trial. After a lengthy inquiry, the court determined that appellant's main complaint was not a total breakdown in communications with his second counsel. Rather, appellant kept focusing on alleged deficiencies of his previous counsel and on the non-existent 911 and cruiser videotapes. Consequently, appellant failed to establish a complete breakdown in communications with counsel so as to prevent the preparation or presentation of a defense. Therefore, we cannot say that the trial court abused its discretion in denying appellant's request for new counsel on the day of trial.
{¶ 65} Accordingly, appellant's seventh assignment of error is not well-taken.
 VI.
{¶ 66} Appellant, in his eighth assignment of error, claims that the trial court erred in imposing consecutive sentences.
{¶ 67} R.C. 2929.14(E)(3) states that:
{¶ 68} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
{¶ 69} "The offender committed the multiple offenses while the offender was awaiting trial or sentencing, * * * or was under post-release control for a prior offense.
{¶ 70} "* * *
{¶ 71} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
{¶ 72} In this case, appellant was convicted of two first degree felonies, with a maximum sentence of nine years for each conviction. The court specifically found that consecutive sentences were necessary to protect the public from future crime and were not disproportionate to the seriousness of the appellant's conduct and to the danger he poses to the public.
{¶ 73} The trial court noted appellant's history of criminal convictions, including felonious armed robbery and burglary, and that he was out on parole from a conviction in Wisconsin when he committed the multiple offenses. In determining sentencing, the court specifically commented that appellant had caused serious psychological harm to his victims and had shown no remorse during trial or other proceedings. In addition, while in jail awaiting trial, appellant was involved in an altercation with an inmate. The court found that consecutive sentences were necessary to protect the public from future crimes. In light of appellant's criminal history, the seriousness of the two crimes, and demeanor during the proceedings, we cannot say that the trial court erred in imposing consecutive sentences.
{¶ 74} Accordingly, appellant's eighth assignment of error is not well-taken.
{¶ 75} The judgment of the Erie County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
 JUDGMENT AFFIRMED.
Peter M. Handwork, P.J., Melvin L. Resnick, J., James R. Sherck, J., CONCUR.